Thomas C. LOSSMAN, et al.,
Plaintiffs-Appellants,

v.

Mary H. PEKARSKE, et al.,
Defendants-Appellees.

No. 82–2197.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1983.

Decided May 16, 1983.

W. Dan Bell, Jr., Bell Law Office, S.C., Madison, Wis., for plaintiffs-appellants.

Maris Rushevics, Anderson, Fisher, Shannon, O'Brien & Rice, Stevens Point, Wis., Daniel W. Hildebrand, Ross & Stevens, P.C., Madison, Wis., for defendants-appellees.

Before CUMMINGS, Chief Judge, and POSNER and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

This suit by Thomas Lossman and his three children charges that the defendants—county welfare and law-enforcement officers in Wisconsin—deprived the plaintiffs of liberty without due process of law, in violation of the Fourteenth Amendment, by removing the children from Lossman's custody without good cause. They seek damages under 42 U.S.C. § 1983.

Lossman was divorced from the mother of his three children but had legal custody of them, and had remarried but was in the process of getting another divorce. He owned a bar, and lived in the back of it with the children, who ranged in age from 9 to 12. On the morning of March 28, 1980, Lossman's wife (the children's stepmother) complained to a county social worker that Lossman was beating the children. A police officer interviewed the stepmother and also the children's natural mother. Both women stated to him that Lossman was constantly drunk, beat and kicked the children brutally, threatened to kill them, kept loaded guns around the house, made one of the children tend bar, and fed them inadequately. The guns made the police decide it would be prudent to remove the children from school rather than wait till they came home after school, and the police did this, pursuant to Wis.Stat. § 48.19(1)(d)(5), which provides, "A child may be taken into custody under ... circumstances in which a law enforcement officer believes on reasonable grounds that ... the child ... is in immediate danger from his or her surroundings and removal from those surroundings is necessary...." The children were interviewed at the police station, corroborated the women's statements, and were forthwith placed in a licensed foster home.

That same afternoon the county prosecutor obtained from the local juvenile court an ex parte order confirming the foster home's temporary custody. The order was pursuant to Wis.Stat. § 48.19(1)(c), which authorizes taking a child into custody on a judge's order based "on a satisfactory showing to the judge that the welfare of the child demands that the child be immediately

removed from his or her present custody." The order also directed the prosecutor to petition by April 1 for an adversary hearing on charges of child abuse and neglect. This part of the order was based on Wis.Stat. § 48.21(1)(b), which requires that such a petition be filed within 48 hours of the child's being taken into custody under court order. Lossman claims that no effort was made to notify him that the children had been removed from his custody until after the court order had been obtained, contrary to the requirement of Wis.Stat. § 48.19(2) that a social worker who takes a child into custody "shall immediately attempt to notify the parent." Although there is a question whether there really was any delay in notifying Lossman, for purposes of reviewing the district court's grant of summary judgment we must accept his claim that there was.

A hearing was held on April 9 (it would have been held earlier if Lossman had not requested additional time for preparation), at which he appeared with counsel. Several witnesses were examined and cross-examined. At the conclusion of the hearing the court ordered the children continued in the custody of the foster home, but gave Lossman visitation rights. On May 7 another, similar hearing was held, at which the court approved an agreement between Lossman's attorney and the county prosecutor whereby the children would be returned to Lossman's physical custody (though legal custody would remain with the county welfare department for six months) under certain restrictions—that he refrain from unreasonably disciplining the children, not let them tend bar, allow their mother to visit them, and undergo psychiatric counseling for his alcoholism. Pursuant to the agreement the charges of child abuse and neglect were dropped. The children were restored to Lossman's legal custody on November 6.

■ The Fourteenth Amendment forbids a state to deprive a person of his liberty without due process of law. Lossman's liberty unquestionably includes the custody that state law gave him of his minor children, *Stanley v. Illinois,* 405 U.S. 645, 657–

58, 92 S.Ct. 1208, 1215–16, 31 L.Ed.2d 551 (1972), so he has satisfied the threshold requirement of showing a deprivation of liberty. But he is not the only plaintiff; and the concept of a child's "liberty" is a little more problematic, since even in a permissive era children remain to a considerable degree under parental control. Also problematic is the claim that transferring the children from their father's custody to that of the state was a deprivation of their liberty—it was in a sense a transfer from one form of bondage to another, regardless of the actual conditions under which Lossman kept the children, which is anyway a matter in dispute. But under Wisconsin law a child can bring a tort action for false imprisonment if he is wrongfully removed from his parents' custody, see *Drabek v. Sabley,* 31 Wis.2d 184, 142 N.W.2d 798 (1966), and maybe that implies a sufficient interest on the part of the child in remaining in that custody to count as a Fourteenth Amendment liberty of which he is deprived if he is removed from that custody. See *Ellis v. Hamilton,* 669 F.2d 510, 514 (7th Cir.1982). But, as will become clear, this issue need not be definitively resolved in this case.

■ The next question in logical sequence is whether Lossman and his children were denied due process—but it is doubtful whether we need reach that question either. Section 1983 plaintiffs sometimes forget that a damage suit under that statute is a tort damage action even though the duty the defendant is charged with having violated is created by the Constitution rather than by common law or a safety statute or regulation. A plaintiff seeking tort damages cannot withstand summary judgment if he has sustained no actual damage, e.g., *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir.1982), and it is virtually certain that the plaintiffs in this case have not. They got an adversary hearing, which we do not understand them to be arguing failed to satisfy the requirements of due process, on April 9; yet the court decided not to return the children to their father's custody. If an identical hearing had been

held on March 28, the same result presumably would have been reached—a decision that the children should be separated (at least temporarily) from their father. Since, whether or not he received due process on March 28, Lossman would in all probability have lost custody of the children on that day, the alleged denial of due process was not a necessary condition, or "but for" cause, of the separation of children from father on which the claim for damages is based.

So plaintiffs have failed to establish a causal connection between the alleged denial of due process and any injury resulting from the removal of the children from Lossman's custody; and the principles of tort causation apply to constitutional as to other tort suits. See, e.g., *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); *Reimer v. Smith*, 663 F.2d 1316, 1322 and n. 4 (5th Cir.1981); *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir.1981). Consistently with those principles, the Supreme Court held in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), that general damages (i.e., damages not based on proof of actual injury) cannot be awarded in a suit alleging denial of due process in its primary sense—which is the sense that the plaintiffs here invoke—of fair procedure. It is not enough for a plaintiff to show that he should have had a hearing of a particular sort; he must show, with some degree of probability, that such a hearing would have prevented the deprivation of which he complains. Otherwise the failure to provide the hearing did not injure him; and tort damages cannot be awarded if there is no injury. See also *Jones v. Reagan*, 696 F.2d 551 (7th Cir. 1983).

Not only is it unlikely that an adversary hearing on March 28 would have made any difference to the outcome of Lossman's custody dispute with the defendants; we can take it as certain that Lossman was not legally entitled to the custody of the children at that time. The findings made in the hearing of April 9 establish, by the principle of collateral estoppel, cf. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), that he was an unfit parent not just on that day but on March 28: all of the evidence of unfitness that was before the court on April 9 was based on events that had happened on or before March 28, as afterwards he was not in a position to continue abusing the children (at least until they were returned to him in May). Even if there is some probability—and no doubt there is some—that an adversary hearing on March 28 would have led to a different outcome, the determination made on April 9 after an adversary hearing more thorough and reliable than any adversary hearing that could have been convened on March 28 shows that a different outcome on March 28 probably would have been error. Lossman cannot get damages for loss of custody that a more reliable hearing showed he was not entitled to retain, just because there is some chance that in a less reliable, because shorter and more hastily convened, hearing he would have been entitled to retain custody of them.

But maybe the complaint can be read to claim damages based on the nature of the March 28 proceedings and not just on the consequence of those proceedings in removing the children from their father's custody—for example, damages for anxiety that Lossman suffered as a result of not being immediately told that the children had been removed from his custody, or, later, told where they were being sequestered. So we shall go on and consider whether there was any denial of due process on March 28, or between then and April 9 (there clearly was not from April 9 on; the hearing on April 9 satisfied the requirements of due process).

■ Although the hearing on March 28 was ex parte, there is no denial of due process in refusing to grant a full adversary hearing before taking away property or liberty, so long as such a hearing is provided later (as it was here) and there is justification for the delay. E.g., *Sutton v. City of Milwaukee*, 672 F.2d 644 (7th Cir.1982). When a child's safety is threatened, that is justification enough for action first and hearing afterward. *Duchesne v. Sugarman*,

566 F.2d 817, 825 (2d Cir.1977). The plaintiffs concede the principle but argue that there was not a true emergency here and that they are entitled to a trial on that question. But they are not. The facts found in the April 9 hearing (and confirmed rather than contradicted by the order entered after the May 6 hearing) show that on March 28 Lossman was a menace to his children. This being so, the defendants would have been imprudent on March 28 to have acted any other way than they did. Maybe they could have reached Lossman earlier in the day to tell him what they were doing, but their failure to do so was not significant. It would have been irresponsible for them to have left the children in Lossman's custody whatever he might have told them. And if there was, therefore, no denial of due process in depriving Lossman of his custody of the children, and therefore no improper deprivation of a constitutionally protected liberty, any anxiety the defendants may have created in Lossman's mind regarding the whereabouts of the children would not support a constitutional claim. Peace of mind is not liberty.

■ We need not decide what if any difference it would make to our resolution of the due process issue if on April 9 the court had ordered the children returned to Lossman's custody forthwith—beyond noting that the district court was justified in citing our recent decision in *Ellis v. Hamilton,* 669 F.2d 510 (7th Cir.1982), as indicative of this court's reluctance to involve federal judges, inexperienced in matters of domestic relations, in custody disputes, in the name of the Constitution and section 1983. But in any event, where the state has a procedure for a prompt, adversary postdeprivation hearing in a child custody matter and the hearing is held and establishes that the state officers acted prudently in removing the child from the parent's custody without a prior hearing, that finding extinguishes a claim that the failure to hold a predeprivation hearing was a denial of due process.

There is widespread concern about over-intrusive public juvenile authorities, see, e.g., Bane, *Is the Welfare State Replacing the Family?,* Public Interest, No. 70, Winter 1983, at 91; and some federal judicial involvement in custody matters is inevitable given the contemporary scope of the due process clause, see, e.g., *Rivera v. Marcus,* 696 F.2d 1016, 1027–28 (2d Cir.1982). But the limited capability of the federal courts to deal effectively with such matters, evidenced by their long-standing refusal to award custody in diversity cases, see, e.g., *Lloyd v. Loeffler,* 694 F.2d 489, 492–94 (7th Cir.1982), places narrow limits on the appropriate federal judicial role even when the issue is damages, as in this case, rather than who shall have custody, as in *Ellis v. Hamilton, supra.* We agree with the district judge that intervention here would have exceeded those limits.

AFFIRMED.