Connie ROBISON, Plaintiff-Appellee,

v.

Susan R. VIA and Harold Harrison,
Defendants-Appellants.

Nos. 190, 206, Dockets 86–7476, –7516.

United States Court of Appeals,
Second Circuit.

Submitted Oct. 2, 1986.

Decided June 17, 1987.

Langrock Sperry Parker & Wool, Middlebury, Vt. (Peter F. Langrock, John L. Kellner, Middlebury, Vt., of counsel), for plaintiff-appellee.

Paul, Frank, & Collins, Inc., Burlington, Vt. (David A. Barra, Burlington, Vt., of counsel), for defendant-appellant Susan R. Via.

Ryan, Smith & Carbine, Ltd., Rutland, Vt. (Alan R. Keyes, Mark H. Kolter, Rutland, Vt., of counsel), for defendant-appellant Harold Harrison.

Before KAUFMAN, KEARSE, and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Susan R. Via, a Vermont Assistant State's Attorney, and Harold Harrison, a Vermont state trooper, appeal from so much of an order of the United States District Court for the District of Vermont, James S. Holden, *Judge*, as denied their motions for summary judgment dismissing the claims of plaintiff Connie Robison brought under 42 U.S.C. § 1983 (1982) and under state law. The complaint alleges that defendants deprived Robison of the custody of her two children and used excessive force against her in violation of her rights to due process, and that they inflicted physical and emotional injury on her in violation of state law. On appeal, Via and Harrison contend principally that the district court should have summarily dismissed Robison's § 1983 claims because defendants enjoyed either absolute or qualified immunity for their acts. Although we reject defendants' claims of absolute immunity, we reverse so much of the order as (1) denied Via and Harrison summary judgment on their defenses of qualified immunity to Robison's § 1983 claims for deprivation of the custody of her children, and (2) denied Via summary judgment with respect to the § 1983 claim against her for excessive force. We affirm the denial of summary judgment as to the § 1983 claim against Harrison for use of excessive force. In addition, we conclude that the district court should decline to take pendent jurisdiction of most of Robison's state-law claims.

## I. BACKGROUND

The present suit arises out of defendants' investigation into a complaint that Robison's then nine-year-old daughter had been sexually abused by her father, Robison's husband. Except to the extent indicated below, there appears to be no substantial dispute as to the facts relating to the initial stages of the investigation and the proceedings following defendants' removal of the children from the custody of their mother. There is substantial dispute as to defendants' confrontation with Robison immediately prior to their removal of the children.

### A. *The Events*

On August 26, 1981, Via received a call from a police detective concerning a complaint by Mrs. Sarah Orrill relating to child abuse. Via telephoned Mrs. Orrill, who requested that a female police officer interview her and her daughter, who had brought the information to Mrs. Orrill.

When it turned out that no female police officer was available, Mrs. Orrill agreed to have Via accompany Harrison, a Vermont state trooper, to the interview.

In the interview, Mrs. Orrill's daughter reported to Via and Harrison statements that Julia Robison, then nine years old, had made to her. Julia said she had been sexually assaulted numerous times by her father since she was six years old, the most recent occasion being two-to-three weeks earlier. Julia said this sexual activity hurt her, that she had a genital rash, and that she was afraid of her father. Julia said that Robison was aware of the situation, both Julia and Julia's half-brother Michael (Robison's son) having reported it to her, and that Robison had simply told Julia not to tell anyone outside the family and had done nothing to prevent recurrence. Mrs. Orrill's daughter said that Julia had also told another schoolmate, the daughter of Mary Vass, of these events.

Via and Harrison proceeded to interview Mrs. Vass's daughter, whose description of Julia's statements was similar to that given by Mrs. Orrill's daughter. In addition, Mrs. Vass's daughter said that Michael had told her that he had told Robison that he had seen Julia in bed with Mr. Robison. Via and Harrison were told further, either by Mrs. Orrill's daughter or by Mrs. Vass's daughter, that in the past Michael had been severely disciplined by his stepfather, including one occasion on which he was struck in the face with a large belt buckle.

From the Vass residence, Via and Harrison went to the Robison residence. Only Robison was at home.

At her deposition, Robison described her conversation with Via and Harrison as follows. After Harrison told Robison about the complaint that Mr. Robison had sexually assaulted Julia, Robison told Harrison that "he must have made a mistake." She admitted that Michael had told her of seeing Julia in bed with Mr. Robison but stated that she had believed that this referred to some innocuous event such as their watching Saturday morning cartoons together. Robison told Via and Harrison that they could talk to the children, who

she said should be home in ten minutes, and "suggest[ed]" that the interview of her children be conducted in her presence. Via and Harrison thereupon left the Robison residence.

Affidavits by Via and Harrison and a contemporaneous Investigation Report by Harrison gave a different flavor to this initial interview of Robison. They described Robison as hostile, indignant, uncooperative, and more interested in knowing who made the complaint than in assessing its validity. Both Via and Harrison stated that they believed Robison was lying to them and would attempt to suppress the truth. They stated that Robison insisted that the interview of her children be conducted in her presence.

After leaving the Robison residence, Via and Harrison found the Robison children outside the Orrill residence. Before Via and Harrison could state why they were there, Julia began to cry; Michael exclaimed that Mr. Robison had not done "it" in a long time, that Via and Harrison should not take his "father" away, and that Michael would be beaten if his father were taken away. Prior to any questioning of the children, Robison arrived in her car.

Robison's version of the ensuing contretemps, given at her deposition in this case, was as follows. When Robison arrived, Michael, who was in the police car, and Julia, who was not in the car, started coming toward her. Robison told them to get in her car, that "we're going home." Harrison told her that she could not take the children home because he and Via were going to take them to the police barracks. Robison told Harrison that he could talk to the children only at her house. The children got into Robison's car, but when Robison tried to get in, "Harrison pushed [her] up against the door and yanked [her] out, and threw [her] up against the fender." Her "hip bones hit against the car," causing bruises that lasted a "[c]ouple weeks, maybe." She also testified that Harrison "twisted [her] arm behind [her] back" and that she suffered bruises on her wrist. Robison testified that Via initially "didn't physically come in contact with [her]," but

that later, when Robison had grabbed Julia around the middle, Via "pr[ied] at [Robison's] fingers or that kind of thing." After Harrison and Via had regained control of the children, Harrison threw Robison's car keys into nearby bushes, and he, Via, and the children departed in the police car.

The Via and Harrison affidavits and Harrison's Investigation Report cast the altercation with Robison in a different light. They stated that Robison emerged from her car shouting and hysterical, while Harrison remained calm. Harrison stated that after Michael and Julia had gotten into Robison's car, he positioned himself in front of the open door and asked the children to get out, that Robison thereupon pushed him, and that he moved her away from the car door and pinned her against the rear fender of her car. He stated that when Robison's hand later came near his revolver, he pushed it away. Via too stated that Robison had reached for Harrison's revolver.

Harrison stated that he threw Robison's car keys onto the Orrill driveway to prevent her from immediately following the police car in her agitated state. Via stated that at no time did she touch Robison.

Michael and Julia were taken to the state police barracks at approximately 3:40 p.m. Julia was then interviewed by Via for approximately 45 minutes to one hour. After being unable to reach a state court judge earlier, defendants finally contacted Vermont Judge Alden T. Bryan, who issued a temporary detention order at 6:00 p.m. pursuant to Vermont Stat.Ann.tit. 33 ("33 V.S.A.") § 643 (1981). The temporary custody order was continued after a hearing the following day.

**B.** *The Denial of Summary Judgment*

Robison's amended complaint asserted (1) due process claims under § 1983 against both defendants for the taking of her children and against Harrison for the use of excessive force against her, and (2) state-law claims against both defendants for intentional infliction of emotional distress as a result of the taking and against Harrison for battery. Jurisdiction was asserted un-der 28 U.S.C. §§ 1331 (federal question), 1332 (diversity of citizenship), 1343 (civil rights), and pendent jurisdiction. Via and Harrison moved for summary judgment dismissing the entire complaint.

In an Opinion and Order dated May 23, 1986, the district court granted both defendants partial summary judgment on the ground of absolute immunity for all injuries caused after the commencement of juvenile proceedings before Judge Bryan at 6:00 p.m. on August 26, 1981. In all other respects, defendants' motions were denied. 636 F.Supp. 268. The court held that defendants' activities prior to contacting Judge Bryan were investigative rather than prosecutorial and therefore were not entitled to absolute immunity. It held that Via and Harrison were not entitled to summary judgment on their defenses of qualified immunity because (a) taking the children into custody pursuant to 33 V.S.A. § 639(3) (1981) must be premised on "immediate danger," which did not exist because Mr. Robison was not present, and (b) taking Michael and Julia to the State Police barracks had violated the command of 33 V.S.A. § 640 (1981) that a person taking a child into custody "shall immediately and without first taking the child elsewhere ... [d]eliver the child to the juvenile court...."

These appeals followed.

**C.** *The Issues on Appeal*

Via and Robison appeal from so much of the district court's order as denied their summary judgment motions, contending principally that they are absolutely or qualifiedly immune from liability on plaintiff's § 1983 claims. For the reasons below, we conclude that they were entitled to summary judgment dismissing all of Robison's § 1983 claims except that for the use of excessive force by Harrison; as to the latter claim, there exist genuine issues of material fact requiring a trial. Further, given the narrow scope of this remaining federal claim, we conclude that most of Robison's state-law claims should also be dismissed.

## II. THE § 1983 CLAIMS FOR DEPRIVATION OF CUSTODY

### A. *Absolute Immunity*

Via and Harrison contend that they are entitled to absolute immunity from any due process claim based on their taking the children into custody either because they were performing a prosecutorial function or because the importance of investigating allegations of child abuse warrants the granting of absolute immunity. We reject both contentions.

### 1. *Prosecutorial Function Immunity*

Absolute immunity accords protection from liability, from suit, and from any judicial scrutiny of the motive for and reasonableness of official action. It is established that prosecutors performing prosecutorial activities "intimately associated with the judicial phase of the criminal process" enjoy such absolute immunity in an action brought under § 1983. *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976); *see Pierson v. Ray*, 386 U.S. 547, 553–55, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967). Prosecutorial functions were accorded absolute immunity at common law and continue to enjoy such protection from attack under § 1983 because "any lesser degree of immunity could impair the judicial process itself." *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986). For similar reasons, such immunity has been extended to other litigating activities of government attorneys, such as initiating and prosecuting child protection litigation. *See Walden v. Wishengrad*, 745 F.2d 149, 152–53 (2d Cir.1984).

The granting or denial of absolute immunity depends more, however, on the function being performed than on the office of the defendant, and the absolute immunity accorded a prosecuting attorney is extended only so far as is necessary to the effective functioning of the judicial process. For example, it extends to the prosecutor's seeking an indictment, because exposing him to liability for the initial phase of his prosecutorial work could interfere with his exercise of independent judgment at every phase of the case, *see Malley v. Briggs*, 106 S.Ct. at 1097, but it generally does not extend to his investigative activities independent of the litigation, because those activities are not integral to the judicial process itself, *see, e.g., Powers v. Coe*, 728 F.2d 97, 103 (2d Cir.1984); *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir.1981); *Lee v. Willins*, 617 F.2d 320, 322 (2d Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980). It also extends to a county attorney's procurement of an arrest warrant to enforce a trial subpoena in an ongoing action to terminate parental rights, *Walden v. Wishengrad*, 745 F.2d at 152, but does not extend to a police officer's applying for a pre-proceeding arrest warrant since, in so doing, the officer is not "a central actor in the judicial process," *Malley v. Briggs*, 106 S.Ct. at 1097. Nor does it extend to a prosecutor's participation in the execution of an arrest warrant since arrests and seizures are normally police functions, and they do not become prosecutorial functions merely because a prosecutor has chosen to participate. *See, e.g., Barr v. Abrams*, 810 F.2d 358, 362 (2d Cir.1987) (execution of arrest warrant "generally would carry the prosecutors out of the realm of *Imbler* and into *Harlow* [*v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity) ]"); *see also Myers v. Morris*, 810 F.2d 1437, 1462 n. 20 (8th Cir.1987) (prosecutor's participation in removal of children is not tantamount to case initiation where parents have not been arrested in connection with alleged molestation of those children).

We see no basis for accepting the contentions of Via and Harrison that in seizing the children they were performing a prosecutorial function. Via's presence at the seizure of the children did not transform what was fundamentally a police function into one that was prosecutorial. Indeed, the presence of any prosecutor at the seizure of the Robison children was pure happenstance, occurring only because no female police officer had been available as requested by Mrs. Orrill to question her daughter. Further, when the Robison children were seized, no proceeding had yet

been commenced, and it does not appear that Via was in a position at that moment to commence the prosecution of a child abuse claim. She and Harrison had not yet asked the children themselves any questions, and they proceeded to interview Julia for nearly an hour and only thereafter obtained a court order for the children's detention. Thus, we think it plain that taking the children was part of the preliminary investigative process and was not "intimately associated with the judicial phase" of the matter.

### 2. *Child Abuse Investigation Immunity*

■ Nor are we persuaded that public officials are entitled to absolute immunity for the removal of children from the custody of their parents simply because they have received a complaint of child abuse. In determining whether a particular function is entitled to absolute immunity from suit under § 1983, our role is to interpret Congress's intent in enacting that section in 1871, and in interpreting that intent, we are guided in large part by the common-law tradition. If the defendant official can point to a common-law counterpart to the privilege he asserts, we will normally uphold the privilege unless to do so would be incompatible with the history or purposes of § 1983. *See, e.g., Malley v. Briggs,* 106 S.Ct. at 1095–96; *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258–71, 101 S.Ct. 2748, 2755–62, 96 L.Ed.2d 616 (1981); *Owen v. City of Independence,* 445 U.S. 622, 637–38, 100 S.Ct. 1398, 1408–09, 63 L.Ed.2d 673 (1980), and cases cited therein. On the other hand, if the defendant cannot show that his actions would have been protected by absolute immunity at common law, he will have a most difficult task in seeking to persuade us that there are compelling policy considerations necessitating the grant of absolute immunity against a suit challenging those actions under § 1983. *See Malley v. Briggs,* 106 S.Ct. at 1096–97; *id.* at 1097 ("Since the statute on its face does not provide for *any* immunities, we would be going far to read into it an absolute immunity for conduct which was only accorded qualified immunity in

1871.") (emphasis in original). Absolute immunity would be accorded to such a defendant only if he were able to show that the function at issue is "so sensitive as to require a total shield from liability," *Harlow v. Fitzgerald,* 457 U.S. 800, 812–13, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982), and that absolute immunity is "essential" if that function is to be properly performed, *Butz v. Economou,* 438 U.S. 478, 506–07, 98 S.Ct. 2894, 2910–11, 57 L.Ed.2d 895 (1978). The Court has rarely yielded to such entreaties and has denied absolute immunity to such important functions as the apprehension of felons, *see Malley v. Briggs,* 106 S.Ct. 1092, and the protection of national security, *see Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Since recognition of a qualified immunity, for reasons discussed in Part II.B. below, "provides ample protection to all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs,* 106 S.Ct. at 1096, qualified immunity has become the norm for the protection of official action, *see Harlow v. Fitzgerald,* 457 U.S. at 807, 102 S.Ct. at 2732, and we are unaware of any instance in which the Supreme Court or this Court has accorded absolute immunity in a § 1983 action for the performance of a function that would have been granted a qualified immunity at common law.

Via and Harrison have not sustained their burden of showing that the seizure, without a court order, of children in order to pursue an investigation of alleged child abuse should be accorded absolute immunity. They have cited no authority—and we are aware of none—that such a seizure was accorded absolute immunity at common law. To the contrary, in general official action taken to prevent harm to another was protected only by a qualified privilege. *See* Restatement (Second) of Torts § 156 (1965).

Nor have they succeeded in persuading us that the official investigation of alleged child abuse is a function so sensitive as to require a total shield from judicial review or that it cannot be performed properly unless all scrutiny is denied. While the

investigation of such allegations is obviously vital to interests of the child and of society as a whole, it is not significantly more important a function in the overall scheme of things than the apprehension of felons or the protection of the nation's security, both of which have been denied absolute immunity. We also doubt that officials' fulfillment of their responsibility to investigate such complaints will be decreased by according them qualified rather than absolute immunity.

Further, we think the delicate nature of the circumstances surrounding such an investigation argues strongly for the granting of only a qualified immunity, in which the objective reasonableness of a removal of the child from the parents' custody would be subject to judicial review. The proper investigation of a child abuse complaint against a parent will normally require that the alleged victim be questioned outside the presence of the parents, and the inquiry into possible sexual abuse is often made difficult by the fact that the sexually abused child frequently will refuse at first to admit the fact of sexual molestation, *see generally Myers v. Morris,* 810 F.2d at 1459–61. The difficulty of pursuing the facts argues for leeway in the investigation; yet we cannot conclude that this justifies absolute immunity for any and every removal of children from their parents' custody following receipt of a complaint of such child abuse. Against the need for taking the children in order to pursue the investigation we must balance that "most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state," *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977), and we think the strong emotional response provoked in anyone hearing an allegation of child abuse counsels against according an official absolute immunity for a taking in the wake of any and every such allegation, lest the official power itself become more likely to be abused. Nor could we rule that absolute immunity for taking the child is appropriate when done in response to a complaint that is credible or in circumstances that

bespeak emergency, for the very introduction of such circumstantial qualifiers leads us out of the realm of absolute immunity, in which evaluation of motive and reasonableness is forbidden, and into the realm of qualified immunity.

In sum, we conclude that society as a whole will benefit more from according investigations of alleged child abuse only a qualified immunity and that the district court properly declined to uphold defendants' assertions of absolute immunity.

### B. *Qualified Immunity*

■ Both police officers and prosecutors enjoy a qualified immunity from suit under § 1983 for investigative acts. *See Malley v. Briggs,* 106 S.Ct. at 1096; *Taylor v. Kavanagh,* 640 F.2d at 452. This immunity shields them both "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738, and "*from suit,*" *Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. at 2816 (emphasis in original). In order to implement the protection from suit, the standard governing the availability of this defense has evolved into one of objective reasonableness, designed to "permit the resolution of many insubstantial claims on summary judgment," *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738.

■ There are a number of ways in which a defendant official may establish a defense of qualified immunity under § 1983. First, purely as a matter of law the defense should be sustained if the court finds that it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution. In *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), for example, prison officials were entitled to summary dismissals of claims that they violated a prisoner's rights under the First and Fourteenth Amendments by interfering with his mail because the prisoner's mail rights under

those amendments "had not yet been declared." *Id.* at 565, 98 S.Ct. at 861.

■ Second, even if the interest asserted by the plaintiff was clearly of a type generally protected by federal law, the defendant is entitled to immunity as a matter of law if it was not clear at the time of the acts at issue that an exception did not permit those acts. Thus, in *Mitchell v. Forsyth*, the United States Attorney General was held entitled to qualified immunity from a suit seeking damages for a warrantless wiretap because, although an individual's right in general to be free of such warrantless intrusions was well established, there was, at the time of the challenged wiretap, a legitimate unresolved question as to the existence of a national-security exception permitting such a wiretap. *See* 472 U.S. at 531–35 & n. 12, 105 S.Ct. at 2518–20 & n. 12.

■ Third, even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights. *See, e.g., Malley v. Briggs*, 106 S.Ct. at 1096. Though this third route to exoneration, unlike the first two, has its principal focus on the particular facts of the case, it too may lead to summary judgment if the defendant "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right. *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, *J.*, sitting by designation). For example, it has long been clearly established that an arrest without probable cause is a constitutional violation. Nonetheless, the arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show either (a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met. *See Malley v. Briggs*, 106 S.Ct. at 1096; *Myers v. Morris*, 810 F.2d at 1454–57 (denial of summary judgment reversed when undisputed facts showed that the existence of probable cause for an arrest warrant was at least arguable); *Floyd v. Farrell*, 765 F.2d 1, 5–6 (1st Cir.1985) (same).

■ In the present case, we conclude that the record established the qualified immunity of Via and Harrison because it was objectively reasonable for them to believe they violated no federal rights when they seized the children. To be sure, in 1981, when the Robison children were taken into custody, it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected "liberty" of which he or she could not be deprived without due process, which would generally require a predeprivation hearing. *See Stanley v. Illinois*, 405 U.S. 645, 649–58, 92 S.Ct. 1208, 1211–16, 31 L.Ed.2d 551 (1972). However, it was, and remains, equally well established that officials may temporarily deprive a parent of custody in "emergency" circumstances "without parental consent or a *prior* court order." *Duchesne v. Sugarman*, 566 F.2d at 826 (emphasis in original); *see also Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983) ("When a child's safety is threatened, that is justification enough for action first and hearing afterward."); *Sims v. State Department of Public Welfare*, 438 F.Supp. 1179, 1192 (S.D.Tex.1977) (three-judge court) (child can be taken into custody without a hearing if there exists an "immediate threat to the safety of the child"), *rev'd on other issues sub nom. Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Newton v. Burgin*, 363 F.Supp. 782 (W.D.N.C.1973) (three-judge court) (upholding statute providing that child may be taken into custody without a hearing if child is in danger or subject to serious neglect, or if it is in child's best interest), *aff'd*, 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974).

In addition, it was and is clear that there is a sufficient emergency to warrant officials' taking custody without a prior hearing if a child is immediately threatened with harm or is bereft of adequate care or supervision. *See Duchesne v. Sugarman,* 566 F.2d at 825–26 (parent was in psychiatric ward and there was no one to take care of children). It is not necessary, for emergency circumstances to exist, that the child be harmed in the presence of the officials or that the alleged abuser be present at the time of the taking. Rather, it is sufficient if the officials have been presented with evidence of serious ongoing abuse and therefore have reason to fear imminent recurrence. *See Lossman v. Pekarske,* 707 F.2d at 291–92 (due process not violated by taking of custody without a prior hearing when witnesses had told officials that parent constantly beat and threatened to kill the children, and kept loaded guns in the house); *cf. Myers v. Morris,* 810 F.2d at 1461–63 (no clearly established violation of due process in summarily removing children when officials arguably had probable cause for arresting one or both parents for molestation of other children). Further, the officials need not defer action merely on account of a parent's protestations of innocence or promises of future protection if they have evidence that that parent has been unwilling or unable to assure the children's safety and well-being in the past. *See Lossman v. Pekarske,* 707 F.2d at 292 ("It would have been irresponsible for [the officials] to have left the children in [the father's] custody whatever he might have told them.").

Within this framework, we think the record establishes beyond any doubt that there was an objectively reasonable basis for Via and Harrison to believe there existed a threat to the health and safety of the Robison children. Two of Julia's schoolmates had reported Julia's descriptions of ongoing sexual abuse by her father; at least one had reported physical abuse of Michael at the hands of his stepfather. The Robison children's own reactions when first approached by the defendants tended to confirm these allegations, as Julia instantly began to cry and Michael spontaneously made a statement strongly implicating his stepfather and expressing fear of receiving a beating.

The belief that the danger was of emergency proportions was likewise objectively reasonable. The spontaneous reactions of the children suggested that they feared immediate reprisal. Further, Robison's own reaction to defendants' inquiries, defending her husband and taking the position that defendants must be mistaken, seriously diminished any confidence that Robison would protect the children from Mr. Robison until a court order could be obtained. And, indeed, Michael's cry that he would be beaten if his stepfather were taken away may have suggested that he feared violence from Robison herself.

Given the undisputed evidence of record, and even drawing all permissible inferences from it in favor of Robison, we conclude that no rational juror could find it not objectively reasonable for Via and Harrison to believe that Julia was the object of ongoing sexual abuse, that Michael was the object of beatings, and that Robison could not be relied on to protect the children from further harm during the time it would take to procure a court order. Accordingly, Via and Harrison enjoyed qualified immunity from Robison's due process claims for the deprivation of custody of her children.

▉ We reject the district court's view that Via and Harrison were not entitled to qualified immunity because their taking of the children violated state statutes—*i.e.,* because the children assertedly were not in "immediate danger" within the meaning of 33 V.S.A. § 639(3) and were not taken directly to the juvenile court as required under 33 V.S.A. § 640. First, even if the phrase "immediate danger" in the Vermont statute sets a standard different from the "emergency" standard under the due process clause as we have described it, a violation of state law neither gives Robison a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim. *See, e.g., Davis v. Scherer,* 468 U.S. 183, 194–96, 104 S.Ct. 3012, 3019–20, 82 L.Ed.2d 139 (1984); *De-*

*ane v. Dunbar,* 777 F.2d 871, 876 (2d Cir. 1985); *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985). Federal constitutional standards rather than state statutes define the requirements of procedural due process. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 540–41, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985). Since the taking of the children was undeniably objectively reasonable under the pertinent federal standards, Via and Harrison were entitled to summary judgment dismissing Robison's § 1983 claim based on that taking.

## III. THE § 1983 CLAIMS FOR EXCESSIVE USE OF FORCE

Via and Harrison also seek reversal of the district court's denial of their motions for summary dismissal of Robison's § 1983 claims for the excessive use of force, contending that they have immunity from suit for the force used in taking custody of the children; Harrison argues also that, in any event, the amount of force he used was not excessive. We conclude that Robison has failed as a matter of law to show any factual basis for such a claim against Via and that Via was therefore entitled to summary judgment dismissing this claim. We conclude that Harrison's challenge to the § 1983 claim against him involves factual issues that, in light of Robison's deposition testimony, were properly not resolved on summary judgment.

### A. *Via*

 Via's motion for summary judgment sought dismissal of Robison's claim for assault on the basis of, *inter alia,* Via's affidavit statement that she had never touched Robison during the struggle for control of the children. The court denied this part of Via's motion because Robison had contradicted this assertion at her deposition by testifying that "[Via] and Harrison were pushing and pulling, trying to separate Julia from me, prying at your [*sic*] fingers or that kind of thing." This is the entire extent of the force ascribed by Robison to Via, however, and we conclude that Robison's assertions are insufficient

as a matter of law to sustain a due process claim against Via for excessive use of force.

Not every push or shove by a state officer constitutes a violation of substantive due process. Whether the constitutional line has been crossed depends on "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). None of Robison's allegations against Via comes close to describing force that was injurious, malicious, or excessive. Notably, while the first count of the amended complaint complained of both "[d]efendants' taking of [the] children," it complained only of "*Harrison's* assaultive behavior" (emphasis added), alleging that "*Harrison* shoved and struck [her]" (emphasis added). The second count of that pleading alleged that Harrison's actions constituted a battery; neither that count nor any other alleged that Via had touched Robison. Consistent with the tenor of her pleading, at her deposition Robison did not testify that Via had participated in or authorized any of the assaultive acts attributed to Harrison. The meagre assertion that Via had pushed or pulled or pried at Robison's fingers, even if it did contradict Via's statement that she had not so much as touched Robison, created at most an issue that was not material since it was entirely insufficient to show excessive force.

We conclude that the force Robison attributed to Via was, as a matter of law, not excessive and that the court should have granted summary judgment dismissing this § 1983 claim against Via.

### B. *Harrison*

 Robison's assertions as to the use of force by Harrison were not so meagre. She testified that Harrison "pushed" her

against the inside of the door of her car, "yanked" her out, "threw [her] up against the fender," and "twisted [her] arm behind [her] back." Robison testified that she suffered bruises lasting a "couple weeks." We have held that assertions such as these are sufficient to prevent the summary dismissal of a § 1983 claim for excessive force. *See Bellows v. Dainack,* 555 F.2d 1105, 1106 & n. 1 (2d Cir.1977).

In *Bellows v. Dainack,* the plaintiff contended that the defendants had used excessive force against him by twisting his arm, pushing him into the back seat of a police car, pulling him by the scruff of the neck, and striking him in the ribs. The jury returned a verdict in plaintiff's favor. On appeal, the defendants contended, *inter alia,* that these assertions were insufficient as a matter of law to state a claim under § 1983. We explicitly rejected this contention. 555 F.2d at 1106 & n. 1. Accordingly, we declined to order that the action be dismissed as a matter of law, and, although we vacated the verdict because of a prejudicial summation and the improper admission of certain evidence, we remanded the case for a new trial. We disagree with the dissent's argument that *Bellows v. Dainack* is not applicable here because it merely affirmed a decision not to dismiss pursuant to Rule 12(b)(6). First, as noted above, the case came to this Court after a trial. Had the facts presented been insufficient to entitle the plaintiff to relief, we would have ordered dismissal of the claim. Instead, we remanded for a new trial. Further, even if *Bellows v. Dainack* had been merely a 12(b)(6) decision, it would govern here because where a complaint has pleaded specific facts such as those discussed in *Bellows,* a decision not to dismiss constitutes a ruling that those very facts if proven are a legally sufficient basis for relief. *See* F. James & G. Hazard, *Civil Procedure* § 3.11, at 153 & n. 10 (3d ed. 1985). In sum, *Bellows* stands for the proposition that assertions virtually identical to those made by Robison under oath at her deposition will, if accepted by the jury, suffice to sustain a claim of due process violation through the excessive use of force.

While Robison did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe. *See Norris v. District of Columbia,* 737 F.2d 1148, 1150–52 (D.C.Cir.1984); *Bowman v. Casler,* 622 F.Supp. 836, 838 (N.D.N.Y.1985); *see also Bellows v. Dainack,* in which the description of the events did not suggest that plaintiff had been seriously or permanently injured.

As indicated in Part I above, the parties have provided conflicting accounts as to whether Robison or Harrison initiated the use of force, how much force was used by each, and whether Robison was reaching toward Harrison's gun. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and were properly not decided by the district court on summary judgment. *See, e.g.,* Fed.R.Civ.P. 56(e) 1963 advisory committee note; *Agosto v. INS,* 436 U.S. 748, 756, 98 S.Ct. 2081, 2086, 56 L.Ed.2d 677 (1978); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 472–73, 82 S.Ct. 486, 490–91, 7 L.Ed.2d 458 (1962); *Centronics Financial Corp. v. El Conquistador Hotel Corp.,* 573 F.2d 779, 782 (2d Cir.1978); 6 *Moore's Federal Practice* ¶ 56.02[10], at 56–45 (2d ed. 1986).

Finally, we note that even though there is no suggestion that Harrison's alleged intentional use of excessive force was anything other than random and unauthorized conduct, dismissal of this claim was not required by the Supreme Court's decisions in *Hudson v. Palmer,* 468 U.S. 517, 530–34, 104 S.Ct. 3194, 3202–04, 82 L.Ed.2d 393 (1984), and *Parratt v. Taylor,* 451 U.S. 527, 535–43, 101 S.Ct. 1908, 1912–17, 68 L.Ed.2d 420 (1981), which held that the random and unauthorized deprivation of state-created property rights does not violate due process when the state provides adequate postdeprivation remedies. The intentional use of excessive force by a public official violates constitutionally created substan-

tive due process rights, *see Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952); *Bellows v. Dainack*, 555 F.2d at 1106 n. 1; *Johnson v. Glick*, 481 F.2d at 1032, and we have held that *Hudson* and *Parratt* do not apply to alleged violations of substantive due process, *see Morello v. James*, 810 F.2d 344, 347–48 (2d Cir.1987) (collecting cases); *McClary v. O'Hare*, 786 F.2d 83, 86 n. 3 (2d Cir.1986). Accordingly, the victim of the intentional, albeit random and unauthorized, use of excessive force by a public official continues to have a claim under § 1983. *See McClary v. O'Hare*, 786 F.2d at 88; *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1500 (11th Cir.1985) (en banc), *cert. denied*, —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *see also Massop v. Coughlin*, 770 F.2d 299, 301 (2d Cir.1985); *Hodges v. Stanley*, 712 F.2d 34, 36 (2d Cir.1983) (per curiam).

## IV. THE STATE–LAW CLAIMS AND THE PROCEEDINGS ON REMAND

Our conclusions that both of Robison's § 1983 claims against Via and Robison's § 1983 claim against Harrison for deprivation of custody should have been summarily dismissed have implications for the proper treatment of the state-law claims asserted against each defendant and for the proper circumscription of the jury's consideration of the remaining claims against Harrison.

### A. *The State-Law Claims*

In addition to her § 1983 claims, Robison seeks to pursue two state-law claims against each defendant: one for battery and one for the infliction of emotional distress resulting from the taking of the children in violation of Vermont statutes governing the deprivation of a parent of the custody of his or her children. These claims do not involve federal questions, and the record indicates that there is no diversity of citizenship. The original complaint alleged that both Robison and the defendants were residents of Vermont; while this assertion is absent from the amended complaint, there is no allegation that defend-

ants are not citizens of the same state as Robison. Hence, the record reveals no basis for federal jurisdiction over Robison's state-law claims except pendent jurisdiction. Given our rulings as to the sustainability of Robison's federal claims, we conclude that the court should decline to exercise pendent jurisdiction over both state-law claims against Via and over the emotional distress claim against Harrison.

■ Under the doctrine of pendent jurisdiction, where state-law claims are joined with a federal claim that has substance sufficient to confer subject matter jurisdiction on the federal court, and the claims derive from a common nucleus of operative fact such that it would ordinarily be expected that they would all be tried in one judicial proceeding, the district court has the power to take jurisdiction of the state-law claims as well. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725–28, 86 S.Ct. 1130, 1138–40, 16 L.Ed.2d 218 (1966). "That power need not be exercised in every case in which it is found to exist," *id.* at 726, 86 S.Ct. at 1139, however, and, as we have noted recently, "[t]he discretion is limited ... by the consideration that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'" *Fay v. South Colonie Central School District*, 802 F.2d 21, 34 (2d Cir.1986) (quoting *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139). Where the federal claim must be dismissed it may be an abuse of the district court's discretion to take pendent jurisdiction of a claim that depends on novel questions of state law. *See id.* (reversing district court's exercise of pendent jurisdiction as abuse of discretion).

■ These considerations require that both of Robison's state-law claims against Via be dismissed. As to the battery claim, we doubt that the court even has the power to take pendent jurisdiction. The complaint did not allege the use of any force by Via, and as it has been developed through Robison's deposition testimony, the § 1983 claim of excessive force now asserted against Via is only that she pushed and

pulled and pried at Robison's fingers. Such a claim is not, of itself, sufficiently substantial even to confer subject matter jurisdiction on the district court. Hence, the court cannot properly take pendent jurisdiction of the state-law claim against Via for battery. Nor can the continued pendency of the § 1983 claim against Harrison for excessive use of force be the basis for the exercise of "pendent party" jurisdiction of the state-law battery claim against Via. *See Aldinger v. Howard,* 427 U.S. 1, 16–18, 96 S.Ct. 2413, 2421–22, 49 L.Ed.2d 276 (1976).

As to Robison's emotional distress claim, though the allegations of custody deprivation are substantial enough to give the court power to exercise pendent jurisdiction, prudential considerations dictate that it decline to do so. This claim depends, in part, on the acceptance of Robison's view as to the requirements of §§ 639 and 640 of the Vermont statutes governing the removal of a child from parental custody. These provisions have not, so far as we are aware, been subject to definitive interpretations by the Vermont state courts, and, as we have noted, it may be that Vermont's concept of "immediate danger" will differ from the concept of "emergency" applicable to a federal due process claim. Absent a violation of federal constitutional rights, the limits, if any, to be placed on official conduct in responding to allegations of child abuse are strictly a matter of state law. Where the district court is not required to resolve novel state-law issues, it is often preferable to decline pendent jurisdiction so that state courts can develop and apply state law on such issues. *See Fay v. South Central Colonie School District,* 802 F.2d at 34; *cf. Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir. 1986). Since there are no other viable claims against Via, the federal court should not take pendent jurisdiction of the claim that Via's taking of the children caused Robison emotional distress in violation of state law.

In sum, both of Robison's state-law claims against Via should be dismissed.

With regard to the state-law claims against Harrison, the considerations discussed above, as well as others, require that the court decline to exercise pendent jurisdiction of the emotional distress claim, even though a federal claim against him is to be tried. Factors that generally militate against the exercise of pendent jurisdiction to permit a joint trial of state and federal claims include (1) the substantial predomination of state-law issues, "whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought," (2) the unsettled nature of state law, and (3) the "likelihood of jury confusion." *United Mine Workers of America v. Gibbs,* 383 U.S. at 726–27, 86 S.Ct. at 1139; *see also Moor v. County of Alameda,* 411 U.S. 693, 716, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973). Each of these factors dictates dismissal of the claim against Harrison for emotional distress, for Robison's amended complaint makes plain that this claim challenges Harrison's decision to take the Robison children into custody as "wrongful," "extreme and outrageous," and violative of state statutes. This claim is therefore far broader in terms of proof, scope, and potential remedy than her § 1983 claim against Harrison for the use of excessive force. Further, as discussed in Part IV.B. below, in deciding the § 1983 claim, the jury should be instructed that Harrison's decision to take custody was privileged under § 1983 and that he was therefore privileged to use nonexcessive force in taking custody. In deciding Robison's intentional infliction claim, however, the jury itself would have to decide whether the taking of custody was privileged under state law. The likelihood of jury confusion would plainly be substantial even if the meaning of the pertinent state statutes were settled. In all the circumstances, we conclude that it would be an abuse of discretion for the district court to exercise pendent jurisdiction over the state-law claim for emotional distress resulting from the taking.

In addition, these considerations counsel that even the scope of the battery claim, over which the court may properly take pendent jurisdiction, should be limited. It

appears that under Vermont law, public officials are privileged to use such force as is reasonably necessary to accomplish a lawful purpose. *See Chase v. Watson*, 75 Vt. 385, 56 A. 10, 11 (1903). To the extent that Robison's battery claim is that the amount of force used to take custody of the children exceeded that reasonably necessary to achieve this end, the court may properly take pendent jurisdiction of it. To the extent, however, that Robison claims that any touching whatever constituted a battery because Harrison was not acting for a purpose that was permitted by state law, that claim would introduce the same problems of expansiveness, jury confusion, and unsettled state law that we have discussed with respect to the state-law claim for emotional distress resulting from the deprivation of custody. Such a battery claim is more properly appended to the state-law claim for the unlawful taking of the children and should be dismissed from this suit.

### B. *Instructions to Jury*

Finally, the above dispositions of Robison's claims have several implications for the instructions to be given to the jury in connection with its consideration of the § 1983 claim for excessive use of force and the pendent claim of battery. Without purporting to be exhaustive, we make the following observations as to distinctions that should be drawn in order to provide a proper framework for the jury's deliberations.

First, in light of our ruling that Harrison's taking of the children is protected by qualified immunity, the charge to the jury should include the instruction that he was privileged to take the children into custody and was privileged to use such force against Robison as was objectively reasonable to gain and maintain that custody. *Cf.* Restatement (Second) of Torts § 134(a) (1965) (common law makes privileged the use of force that the actor reasonably believes is necessary to maintain custody).

Second, the jury should be advised that it may have to consider separately the questions of what events occurred and how much force was used. If the jury accepts the testimony, in accordance with Harrison's version of the events, that Harrison did no more than pin Robison against the car, it must return a verdict for Harrison, for that act alone could not reasonably be found, in the circumstances, to constitute excessive force. Alternatively, if the jury finds that Harrison performed the acts attributed to him by Robison, it must still draw its own conclusions as to whether the amount of force used was excessive in the circumstances. For example, it may conclude that Robison initiated the use of force and that the acts attributed to Harrison constituted merely a reasonable response; or it might credit the testimony that Robison seemed to reach for Harrison's gun, an act that would require a conclusion that the acts attributed to Harrison were not excessive. In either of these examples, the jury would be required to return a verdict in favor of Harrison.

Third, the jury should be advised as to any difference between the excessiveness requirements of the § 1983 claim and those of the state-law battery claim, for, in general, "the constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery...." *Johnson v. Glick*, 481 F.2d at 1033. Thus, though it may be that under state law the use of any force in excess of the amount needed to accomplish the privileged taking of the children could expose Harrison to liability for battery, *see Chase v. Watson*, 56 A. at 11; *but cf.* Restatement (Second) of Torts § 132 comment *a* (1965) (no liability for force used in making arrest unless force is "clearly" excessive), the standard for liability under § 1983 is generally that the amount of force must have been "such as to 'offend hardened sensibilities'" or have constituted force that was "'brutal' and 'offensive to human dignity,'" *Johnson v. Glick*, 481 F.2d at 1033 n. 6 (quoting *Rochin v. California*, 342 U.S. at 172, 174, 72 S.Ct. at 209, 210).

Finally, the instructions should make clear that, if the jury finds Harrison liable for excessive use of force, any damage award must be strictly limited to the injury caused by the excessive component of the force used. Damages may not properly be

awarded either for the nonexcessive component of the force used or for the taking of the Robison children into custody. *Cf. NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918, 921–23, 102 S.Ct. 3409, 3428, 3430–31, 73 L.Ed.2d 1215 (1982) (damages cannot be awarded for part of course of conduct that is protected activity). Given the number and variety of distinctions that the jury will likely be required to draw, both as to liability issues and as to damages issues, the district court might well consider submitting written interrogatories to the jury pursuant to Fed.R.Civ.P. 49 in order to ensure that each of the pertinent factors is independently considered and decided.

## CONCLUSION

We reverse so much of the order of the district court as denied Via's motion to dismiss the complaint against her and as denied Harrison's motion to dismiss the § 1983 claim against him for deprivation of custody and all state-law claims except the battery claim that the force used exceeded the amount needed to achieve the privileged taking of the children. We remand for entry of judgment in favor of Via; with respect to the two claims remaining against Harrison, we remand for further proceedings not inconsistent with this opinion.

Costs to Via; the other parties shall bear their own costs.

ALTIMARI, Circuit Judge, concurring in part and dissenting in Part:

I respectfully dissent from Parts III(B) and IV of the majority opinion, because I do not agree that Robison's § 1983 excessive force claim against Harrison should proceed to trial. As the majority points out, the degree of force which is sufficient to support a state-law battery claim, does not necessarily rise to the level of a constitutional violation. *See Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). In *Johnson*, Judge Friendly developed the following guidelines for analyzing claims of undue force:

In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. *Id.* at 1033. Applying the *Johnson* analysis to the facts of this case leads me to conclude that the force used by Harrison was as a matter of law not unconstitutionally excessive.

At Robison's pre-trial deposition, the following colloquy took place between Robison and Via's attorney:

Robison: Kids got in the car, and then when I tried to get in the car, Harrison pushed me up against the door and yanked me out, and threw me up against the fender.

Q: Did he physically hurt you in any way?

R: Well, he didn't break any bones if that's what you mean. I had a few bruises, but other than that—

Q: You did have bruises the next day?

R: Yeah, on my wrist and here where, you know, my hip bones hit against the car.

Q: Did you go to have any medical treatment for those injuries?

R: No.

Q: Those bruises went away in a few days?

R: Couple weeks, maybe.

Q: You don't have any lasting physical injuries as a result of this, do you?

R: I don't suppose so.

. . . .

Q: Then what happened?

R: Michael got out because Harrison like I say threw me up against the fender, twisted my arm behind my back. Michael got out of the car to try to help me, you know. I said Harrison leave me alone. Stop yanking me around.

Suppl.App. at 26–27.

If we were reviewing the denial of a 12(b)(6) motion, I would have no difficulty

in finding that these allegations stated a claim upon which relief could be granted. Indeed, the proposition is well established that allegations such as Robison's are sufficient to withstand dismissal under Fed.R. Civ.P. 12(b)(6). *See, e.g., Massop v. Coughlin,* 770 F.2d 299 (2d Cir.1985); *Hodges v. Stanley,* 712 F.2d 34 (2d Cir.1983); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) ("complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

In the present case, by contrast, we review a denial of summary judgment. A claim of excessive force brought under § 1983 should not survive a motion for summary judgment unless there is a genuine dispute over whether the force rose to the level of a constitutional deprivation. *See* Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Even when viewing the record in this case in the light most favorable to Robison, *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), I do not believe a rational fact-finder could return a verdict for Robison on her excessive force claim. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

It will be recalled that Part II of the majority opinion, in which I concur, held that Harrison and Via did not violate any of Robison's federal rights by taking her children into custody. Robison, by her own admission, tried forcibly to prevent the appellants' detention of her children. During the ensuing struggle, Harrison restrained Robison for a short time, but there is no suggestion that he assaulted her maliciously or intended to harm her. Rather, he restrained her only so long as was necessary to enable appellants to proceed with their removal of the children. At most, Robison suffered a few bruises when she attempted to prevent Harrison and Via from removing the children from what appellants had already decided was a dangerous family environment.

When Robison's version of the events is analyzed according to the *Johnson* guidelines, only one reasonable conclusion emerges: there was a need for a minimal amount of force in order to prevent Robison from regaining custody of the children. Harrison and Via employed no more force than was necessary to accomplish that goal, and inflicted only very minor injury on Robison. Finally, Harrison's application of force was not "malicious" or "sadistic." There is simply no support in the record for the existence of a genuine dispute as to whether the force used by Harrison was excessive under the circumstances.

The majority relies heavily on *Bellows v. Dainack,* 555 F.2d 1105, 1106 & n. 1 (2d Cir.1977) to support its conclusion that the district court correctly denied summary judgment to Harrison on the excessive force claim. This reliance is misplaced. In *Bellows,* judgment had been entered for the plaintiff in a § 1983 excessive force claim against two police officers. This court reversed the judgment and remanded the case for a new trial because of the improper admission of certain evidence. At the outset of the opinion, however, the *Bellows* panel observed in a footnote:

> Defendants argue here, as they did on two occasions before the district court, that the plaintiff has failed to state a claim for relief under 42 U.S.C. § 1983. The district court properly rejected this contention....

*Id.* at 1106 n. 1.

This rather opaque statement by no means compels us to deny Harrison summary judgment on Robison's excessive force claim. We do not know what motions were made in the district court in *Bellows.* If in fact the defendants had moved for summary judgment, we have no information about the record before the court at

that stage. Moreover, the *Bellows* panel's conclusion that plaintiff "stated a claim" under § 1983, uses the language of Fed.R. Civ.P. 12(b)(6), rather than the Rule 56 standard for summary judgment.

District courts in this and other jurisdictions have previously granted summary judgment to § 1983 defendants in the face of allegations similar to Robison's. *See, e.g., Estes-El v. State of New York,* 552 F.Supp. 885, 890 (S.D.N.Y.1982) (Lasker, J.) (summary judgment granted to defendant where arrestee alleged he was handcuffed too tightly, shackled to a wall and forced to remove his headgear); *Metcalf v. Long,* 615 F.Supp. 1108, 1121 (D.Del.1985) (summary judgment granted where arrestee alleged that police smashed him to the ground and caused minor injuries by putting pressure on his neck and head); *Moats v. Village of Schaumburg,* 562 F.Supp. 624, 629 (N.D.Ill.1983) (summary judgment granted where arrestee alleged that although she offered no resistance, officer roughly twisted her arm and pulled it up behind her back).

Consequently, I would grant Harrison summary judgment on the excessive force claim, and would direct that that claim, as well as the pendent state battery claim against him, be dismissed. In all other respects, I agree with the majority opinion.