**ESTATE OF Kenneth JACKSON, Delijah Jackson, and Isabelle Jackson, individually and in their capacities as personal representative of the Estate of Kenneth Jackson, Plaintiffs,**

v.

**CITY OF ROCHESTER, ex-City Manager Peter Korn, Police Chief Delmar E. Leach and Ptl. Ceferino Gonzalez, and Police Officers "John Roe", "John Coe" and "John Loe", individually and in their official capacities Mayor Thomas I. Ryan and Police Chief Gordon Urlacher in their official capacities, Defendants.**

No. Civ. 86–0615L.

United States District Court,
W.D. New York.

Jan. 31, 1989.

Aaron Frishberg, Stevens, Hinds & White, New York City, for plaintiffs.

Patrick Naylon, Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

This action arises from the death of Kenneth Jackson, who was shot and killed by Rochester police officer Ceferino Gonzalez in November 1984. The complaint alleges

1. The court has previously granted a portion of defendants' motions, dismissing the action against defendants Thomas Ryan and Gordon Urlacher; dismissing the action against all defendants in their official capacities; dismissing the third cause of action alleging denial of access to a public accommodation; and dismissing the claim for injunctive relief.

causes of action under 42 U.S.C. §§ 1983 and 2000a, and under state law.

The decedent's parents, Delijah and Isabelle Jackson, suing on behalf of Kenneth Jackson's estate and on their own behalf, commenced this lawsuit against Officer Gonzalez, the City of Rochester (City), ex-City Manager Peter Korn, Police Chief Delmar E. Leach, and unidentified officers of the Rochester Police Department, individually and in their official capacities (collectively, municipal defendants), and against Mayor Thomas Ryan and Police Chief Gordon Urlacher in their official capacities.

All defendants have moved for judgment on the pleadings or alternatively for summary judgment. For the reasons discussed below, defendants' motions are granted.[1]

## FACTS

The principal witnesses to the shooting were officer Gonzalez and the decedent's cousin Fred Barfield.[2] Although there are some differences, Barfield's version of the confrontation comports to a great extent with Gonzalez' version. Therefore, many of the facts are undisputed.

On November 16, 1984, at approximately 3:20 p.m., Officer Gonzalez began a routine foot patrol of the area known as "Downtown 239". One of the areas of the foot patrol to be given particular attention was Don's Arcade (Arcade). After walking through the Arcade, Gonzalez spoke to Manager Clementine McManus who expressed "concern" about an individual, later identified as the decedent Kenneth Jackson, who was hanging around the Arcade, but not playing any games. After observing Jackson for a few minutes, Gonzalez left the Arcade and continued his patrol in the Main Street area.

Approximately twenty-five minutes later, Gonzalez returned to the Arcade. As he

2. In support of their motion, defendants submitted the Affidavit of Officer Gonzalez, sworn to May 11, 1988, which relates his version of events. In opposition to defendant's motion, plaintiffs submitted the sworn statement of Fred Barfield, made on the day of the incident, relating what he observed during the encounter. Plaintiffs' Memorandum of Law in opposition to summary judgment, Exhibit 1.

walked through the premises, he observed Jackson "passing some sort of aluminum material" to another man who was later identified as Jackson's cousin, Fred Barfield. While Jackson and Barfield stood talking, Jackson had reached in his pocket and had pulled out an eighteen inch tape that was lime green on one side and silver on the other. As Jackson and Barfield were examining the tape, Gonzalez came up behind them. Gonzalez asked the two what they were doing. Barfield responded that they were not doing anything; however, Jackson did not respond to Gonzalez' question. Rather, as Gonzalez reached for the tape, Jackson turned away from the officer, started to walk around a pinball machine and toward the front exit of the Arcade. As Jackson walked toward the front exit, Gonzalez walked up the aisle parallel to Jackson, so that he could speak to him before he left the premises. Barfield followed Jackson in an attempt to stop him from leaving the Arcade before he had responded to Gonzalez' questions.

Gonzalez caught up with Barfield and Jackson and stood in front of them. Barfield states that Gonzalez asked: "What do you have there? Let me see it." He then reached out and took the tape from Jackson's hand, and called for a backup on his portable radio. Jackson continued to take steps in his attempt to exit the building. Gonzalez pulled out his PR–24, a device comparable to a nightstick, and swung it in front of him. There is no dispute that the officer neither struck nor attempted to strike anyone. Gonzalez then put the nightstick under his arm.

Barfield began walking to the front door of the Arcade, leaving Gonzalez and Jackson standing face to face. Jackson placed his hand inside his clothing in the area of his chest. Gonzalez directed Jackson to remove his hand from inside his clothing at least two times. There is no dispute that when Jackson removed his hand from his clothing, he pulled out a large butcher knife.[3]

Gonzalez states that Jackson began to move from side to side in an "elliptical yet unpredictable manner," and rotated the knife while moving it from hand to hand as he advanced toward him. Gonzalez further states that it is at this point that he drew his service revolver with his right hand and ordered Jackson to stop. Jackson ignored Gonzalez' warnings and commands to stop. Gonzalez alleges that Jackson then moved the knife to an "overarm position" and began to "lunge" at him with the blade pointed toward him. He fired his service revolver three times in order to ward off Jackson's attack. Jackson fell to the floor mortally wounded. Gonzalez holstered his service revolver, and placed his foot on the knife to prevent Jackson from reaching it because even as he lay wounded on the floor, Jackson moved his hand toward the knife.

Barfield essentially confirms Gonzalez' version. He claims that when Jackson put his hand in his clothing, Gonzalez put away his nightstick and put his hand on his revolver. When Jackson did not respond to the officer's command that he remove his hand from his clothing, Barfield states that Gonzalez pulled out his revolver and pointed it to the ceiling. At this point, Barfield went out of the front door of the Arcade and observed Gonzalez and Jackson through the front window. Barfield saw Jackson pull the knife from his clothing. He then went back to the front door and stood in the open door way. He heard Gonzalez direct Jackson to put the knife down at least two times. Barfield himself asked Jackson several times to put the knife down. He alleges that Jackson held the knife about "shoulder high" with the blade pointing toward the ceiling. Gonzalez pointed his gun toward Jackson and again asked him to put the knife down. Barfield stated that Jackson made a "motion" towards Gonzalez with the knife blade still pointing upward. Barfield heard two shots and saw Jackson fall to the floor.

---

**3.** Barfield described the knife that Jackson held as a kitchen knife that was six to eight inches long with a light brown wood handle. Plaintiffs do not dispute that the knife Jackson held was a weapon capable of inflicting serious injury.

Based on these facts, plaintiffs assert causes of action for violations of their decedent's, and their own, civil rights under the Thirteenth and Fourteenth Amendments, and 42 U.S.C. §§ 1983, 1985, 2000a et seq., as amended. They allege that:

1. Officer Gonzalez used excessive and deadly force without justification, and thereby intentionally, wantonly, maliciously, recklessly, and negligently caused Jackson's death.

2. The City and other defendants conspired with each other to deprive black residents of Rochester of their civil rights and of the equal protection of the laws by "tacitly and explicitly agreeing not to discipline, investigate or curb police officers who used deadly force or excessive force on Black residents or [sic] Rochester, New York and failed to correct such abuses by training, screening, or supervising the officers of the Rochester Police Department to avoid recurrence of use of excessive and deadly force on Black residents of Rochester."

3. Officer Gonzalez' conduct deprived plaintiff's decedent of access to a public accommodation because of his race.

4. The defendants' actions have caused plaintiffs to fear for their lives and liberty, and thus, have deprived them of the equal protection of the laws.

Plaintiffs also assert causes of action under state law for assault, loss of consortium and wrongful death.

## DISCUSSION

Defendants have moved for summary judgment dismissing the action against Officer Gonzalez on the ground that he is entitled to qualified immunity. They have also moved to dismiss the action against all other defendants or alternatively for summary judgment on the grounds that Officer Gonzalez' actions were justified under the circumstances and that the City had no policy upon which liability may be predicated.

### A. *Summary Judgment Standard*

The purpose of a summary judgment motion "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Under Rule 56 of the Federal Rules of Civil Procedure, the moving party has the initial burden of informing the court of the basis for the motion for summary judgment and of identifying the portions of relevant documents which demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In clarifying the standards governing summary judgment, the Supreme Court has stated that the moving party discharges its burden by "pointing out to the District Court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

Once the moving party has met this burden, Rule 56(e) requires that the nonmoving party go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." An argument that there are material factual issues which preclude a grant of summary judgment must be supported by concrete particulars. *Dressler v. MV Sandpiper,* 331 F.2d 130, 133 (2d Cir.1964). Mere denials or general allegations without evidentiary support will not defeat a summary judgment motion. *Engl v. Aetna Life Ins. Co.,* 139 F.2d 469, 473 (2d Cir.1943). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Applying these principles in the instant case, I conclude that plaintiffs have failed to discharge their burden of showing that there are disputes of material facts which under the governing law would preclude summary judgment, and that the undisputed facts mandate the entry of summary judgment for defendants on plaintiffs' federal claims.

### B. *Liability under Section 1983*

1. Officer Gonzalez—Qualified Immunity

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982),

the Supreme Court enunciated an objective standard for determining whether government officials may enjoy qualified immunity. Such officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. This test of the objective legal reasonableness of an official's acts as measured by reference to clearly established law "permit[s] the resolution of many insubstantial claims on summary judgment." *Id.*

The qualified immunity defense is available to state law enforcement officers who are sued for constitutional violations under section 1983. *Harlow,* 457 U.S. at 818, n. 30, 102 S.Ct. at 2738, n. 30; *Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987). One of the several ways in which an official may establish a defense of qualified immunity is if he shows that "it was objectively reasonable for him to believe that his acts did not violate [clearly established] rights." *Robison,* 821 F.2d at 921. A grant of summary judgment is appropriate if the defendant official " 'adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robison,* 821 F.2d at 921. In the context of an unconstitutional arrest without probable cause it is well established that the officer "is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show either (a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met." *Id.*

The undisputed facts in the present case establish that Officer Gonzalez is entitled to qualified immunity under the standards enunciated in *Robison.* On these facts, it was objectively reasonable for Gonzalez to use deadly force in defense of Jackson's life-threatening actions. Or, at the very least, it is clear that "officers of reasonable competence," *Robison,* 821 F.2d at 921, could disagree on whether such use of force was necessary under the circumstances.

At the time of this unfortunate incident, it was clear that New York law provided justification for the use of deadly force when a police officer has reasonable cause to believe that a suspect poses a threat of serious physical harm to himself or others. New York Penal Law § 35.15 provides that a police officer may use deadly force upon another person if he "reasonably believes that such other person is using or about to use deadly physical force." N.Y.Penal Law § 35.15(2)(a)(ii) (Consol.1984). Similarly, Penal Law § 35.30 provides that in the course of effecting or attempting to effect an arrest, a police officer may use deadly force if he "reasonably believes" that "the use of deadly physical force is necessary to defend the police officer ... or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force." N.Y.Penal Law § 35.30(1)(c) (Consol.1984).

Plaintiffs have not cited, nor has the court found, any decision holding that these Penal Law provisions were unconstitutional either on their face or in their application in circumstances similar to those involved in the instant case. Indeed, recognizing the well established common law which is embodied in Penal Law §§ 35.-15 and 35.30 and similar statutes, the Supreme Court in *Tennessee v. Garner,* 471 U.S. 1, 11–12, 105 S.Ct. 1694, 1701–02, 85 L.Ed.2d 1 (1985), reiterated that if a suspect threatens an officer with a weapon, he may use deadly force.

Moreover, Rochester Police Department (RPD) policy set forth in General Order (G.O.) 77–7, which was in effect at the time of the shooting, authorizes the use of deadly force in self-defense or in defense of others. General Order 77–7 which governs the use of firearms by police personnel essentially embodies the New York Penal

Law provisions concerning use of deadly physical force. It provides that it is the policy of the RPD that an officer is justified in using deadly physical force upon another person to defend himself or a third person when he reasonably believes such other person is using or about to use deadly physical force. G.O. 77–7, § V(A)(1).

Both Officer Gonzalez' and Barfield's version supports the use of deadly force. When Jackson was confronted by Gonzalez, he placed his hand inside his jacket where he could reach a weapon. Gonzalez asked Jackson to put his hand down "at least twice." When Jackson did not respond to that request, Gonzalez removed his revolver and pointed it at the ceiling. Jackson then pulled out a knife from his jacket at which point Gonzalez asked Jackson to put the knife down "at least twice." Gonzalez fired his revolver only after Jackson suddenly "made a motion toward" him with the upraised knife.

Officer Gonzalez acted in accordance with RPD policy in displaying and using his service revolver. Gonzalez was authorized to draw and point his firearm to emphasize and implement his command that Jackson move his hand from his chest area, or if he reasonably perceived a danger that he may have to defend himself, or others, because Jackson concealed a weapon which he may have used against him. He was authorized under state law and RPD policy to fire his revolver if he reasonably believed that Jackson was about to use deadly force against him.

Plaintiffs have failed to submit any evidence that Jackson acted contrary to New York law or RPD rules. Plaintiffs have also failed to demonstrate that Jackson violated accepted norms of police conduct in such a circumstance. There is no expert evidence before the court that Gonzalez' actions were unreasonable, arbitrary or contrary to accepted police practice.

Under the circumstances, I conclude that it was objectively reasonable for Gonzalez to believe that Jackson posed a real and imminent threat of death or serious bodily harm, or at least officers of reasonable competence could have disagreed as to whether such force was necessary. Thus, Gonzalez' use of deadly force in self-defense did not violate any clearly established right of another person.

Because of the tragic conclusion to this brief encounter between citizen and police officer, there may be a tendency to suggest, after the fact, other steps the officer could have taken to disarm Jackson. Had Gonzalez attempted other extraordinary means to subdue Jackson and succeeded, he certainly would have been viewed as a hero. On the other hand, such actions certainly could have failed, resulting in almost certain serious injury or death to Gonzalez. I do not believe that society should expect or demand that a police officer always take extraordinary, life-threatening means to defend himself or face civil liability for failure to do so. The super-cop of television and movies who disarms felons in hand-to-hand combat or with a well-placed shot to the hand should not be the standard by which we determine whether there has been a violation of a citizen's constitutional rights.

Plaintiffs have not cited any constitutional requirement that police officers faced with the imminent use of deadly force against them or others should not respond in kind. *See O'Neal v. DeKalb County, GA.*, 667 F.Supp. 853, 858 (N.D.Ga.1987), *aff'd*, 850 F.2d 653 (11th Cir.1988) ("[T]he Constitution does not require police officers to use a minimum of violence when attempting to stop a suspect from using deadly force against police officers or others."). Such a requirement would expose police officers to unnecessary risks. The Supreme Court has stated:

[I]t would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.... every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.... In view of these facts, we cannot blind ourselves to the need for

law enforcement officers to protect themselves....

*Terry v. Ohio,* 392 U.S. 1, 23–24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968) (footnote omitted).

Given the undisputed evidence of record and drawing all permissible inferences from it in favor of plaintiffs, no reasonable jury could conclude that it was objectively unreasonable for Officer Gonzalez to believe that his use of deadly force did not violate plaintiffs' decedent's rights. Further, officers of reasonable competence could disagree on whether some less drastic measure than the use of a gun would have been appropriate under the circumstances. Accordingly, Officer Gonzalez is entitled to qualified immunity as a matter of law.

### 2. Claims Against the City and other Personnel

The municipal defendants contend that they are not liable to plaintiffs because Officer Gonzalez' use of deadly force in self-defense did not violate plaintiffs' decedent's constitutional rights and, even if there was a constitutional violation, the City has no policy or custom that was the moving force for such violation. I agree with both contentions.

#### a. *Constitutional Violation*

■ Civil rights actions under § 1983 alleging excessive use of force during encounters between law enforcement officers and citizens may be based on the alternative constitutional theories that such use of force violated the individual's substantive due process rights under the Fourteenth Amendment and/or his rights under the Fourth Amendment. In the instant case, plaintiffs claim that Officer Gonzalez' conduct deprived their son of his life in violation of the Fourteenth Amendment. The amended complaint does not cite a violation of the Fourth Amendment. However, the parties' arguments on this motion are framed in terms of the analysis under the Fourth Amendment's test of the objective reasonableness of Officer Gonzalez' conduct.

■ Based on the undisputed facts, the encounter between Gonzalez and Jackson did not give rise to a Fourth Amendment violation. The only time that a seizure implicating the Fourth Amendment occurred was when Gonzalez finally stopped Jackson from leaving the Arcade by waiving his nightstick.[4] There was no arrest or attempted arrest, however, "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Mendenhall,* 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). Gonzalez' brandishing of the nightstick could reasonably be construed as a show of authority from which a "reasonable person would have believed that he was not free to leave," *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. Indeed, Barfield stated that he perceived the Officer's actions to mean that "if we did make a move, he would strike us." Sworn Statement of Fred Barfield at 3.

Determining whether a seizure was constitutional requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner,* 471 U.S. at 8, 105 S.Ct. at 1699, quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed. 2d 110 (1983). In order to effectuate the important governmental interest in effective law enforcement, in appropriate circumstances and in an appropriate manner, a police officer may approach an individual for the purpose of investigating criminal activity, without probable cause to make an

---

**4.** Officer Gonzalez's initial approach of Jackson and Barfield and his questioning concerning their activity did not constitute a seizure. Jackson did not answer Gonzalez's question. Rather he walked away and attempted to exit the build-ing with the Officer following until Barfield intervened and requested that Jackson speak to the Officer. Thus, this initial encounter did not implicate the Fourth Amendment.

arrest. *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880. "The legality of an investigatory stop depends on (1) the nature and extent of the government's need for the stop, which must be judged according to the importance of its law enforcement interests under the circumstances, and (2) the reasonableness of the stop, which depends mainly on the degree of police intrusion on the [individual's] freedom of movement." *United States v. Pelusio*, 725 F.2d 161, 165 (2d Cir.1983). In order to justify the intrusion the police officer must be aware of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. 88 S.Ct. at 1879. *Pelusio*, 725 F.2d at 165.

In this case, Officer Gonzalez had articulable facts creating a ground for reasonable suspicion of unlawful activity. Therefore, his investigatory stop did not violate the Fourth Amendment. In approaching Jackson and Barfield, Officer Gonzalez was undertaking a legitimate investigation of possible criminal activity. Plaintiffs have not disputed that the Arcade was one of the areas that was designated as requiring special attention or that the Arcade's manager expressed concern to Officer Gonzalez that Jackson was loitering at the premises. Gonzalez observed Jackson and Barfield handling, in what appeared to be a furtive manner, an aluminum object which in the officer's experience may have indicated that an illicit drug transaction was imminent or already occurring. Further, plaintiffs have not disputed that Gonzalez was unaware of Jackson's history of mental illness at the time of their encounter. Clearly, Jackson's walking away from the police officer without any response to his inquiry and before he could examine the aluminum object is unusual behavior. Con-

sidering all this information that was known to Gonzalez at the time, it was not unreasonable to believe that Jackson's behavior was suspicious and may have been connected with criminal activity. Therefore, Gonzalez' investigatory stop to question Jackson and Barfield was a justifiable and reasonable intrusion under the Fourth Amendment.

■ The crux of this case, however, is not the investigatory stop, but Jackson's slaying, which did not implicate the Fourth Amendment. Gonzalez did not shoot Jackson for the purpose of seizing him. The stop for purposes of investigating Jackson's behavior had been successfully *completed* in a reasonable manner. The shooting was unrelated to the stop. Gonzalez did not draw his revolver and fire it to apprehend Jackson; rather, he fired his revolver in self-defense because Jackson suddenly moved toward him with a raised knife. Therefore, Gonzalez' shooting of Jackson in self-defense was not a seizure within the purview of the Fourth Amendment. *See Dodd v. City of Norwich*, 827 F.2d 1, 7 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 701, 98 L.Ed.2d 653 (1988).[5]

■ Thus, the only constitutional basis for plaintiffs' claims under § 1983 is a deprivation of their rights to substantive due process. Broadly defined, substantive due process is violated by police conduct that "shocks the conscience" or that constitutes force that is so "brutal" as to "offend even hardened sensibilities." *Rochin v. California*, 342 U.S. 165, 172–173, 72 S.Ct. 205, 209–210, 96 L.Ed. 183 (1952). In the seminal case of *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), the Second Circuit enunciated a more precise guiding standard for analyzing substantive due pro-

---

**5.** Even if the Fourth Amendment were found to be applicable in this case, the undisputed facts establish that the shooting of Jackson did not violate that constitutional provision. In balancing the competing interests involved here, it is axiomatic that Jackson had a fundamental interest in his own life and his seizure by use of deadly force is the most intrusive imaginable. However, against that fundamental interest are a variety of governmental interests in effective

law enforcement, including not only investigating possible criminal activity but also the physical safety of law enforcement officers. When a police officer has reasonable cause to believe that a suspect poses a threat of serious physical harm to himself or others, as the facts of this case bear out, he does not violate the Fourth Amendment by using deadly force to protect himself. *Garner*, 471 U.S. at 11–12, 105 S.Ct. at 1701–02.

cess violations. *Johnson* teaches that not every injury that may be actionable under state tort law gives rise to a federal constitutional violation. The *Johnson* court held that:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

481 F.2d at 1033. Applying the *Johnson* factors to the instant case, I find that the undisputed facts establish that Officer Gonzalez' conduct did not transgress the bounds of substantive due process. As to the first and third factors, it is clear that Officer Gonzalez shot Jackson three times as he suddenly moved toward him with a raised knife, and that as a result of the shooting Jackson died. The remaining factors must be analyzed to determine whether, as a matter of law, Gonzalez' conduct was reasonable and motivated by a genuine fear for his own safety or whether it was unjustified. As to the second factor, it is unquestionable that there was a need for the use of force. Further, the amount of force Gonzalez used was proportionate to the need to use force to defend himself against Jackson's attack with the knife. As discussed, *supra,* Officer Gonzalez did not display his weapon until Jackson refused to obey his command to remove his hand from the chest area of his jacket. Under the circumstances, this cautionary measure by Gonzalez was justified. It was reasonable to interpret Jackson's behavior as threatening. Common experience teaches that, all too often in encounters such as this, when a suspect reaches for an article in his clothing, this is not an innocent gesture, but one that signals a threat to the officer. In fact, Gonzalez' apprehension that Jackson concealed a weapon was realized when Jackson produced a knife. Gonzalez did not fire his revolver until Jackson, who had not heeded the officer's commands, and later warnings, to desist in his menacing and threatening behavior, lunged at him with a raised knife. He fired the first shot as Jackson charged toward him with the butcher knife, and immediately fired two additional shots because Jackson continued to move toward him.

Plaintiffs claim that summary judgment is inappropriate because there is a question of fact concerning whether Officer Gonzalez initiated the use of force. They contend that when Gonzalez seized the metallic strip from Jackson's hand, he set the "confrontational tone" which ultimately escalated to the use of deadly force. This contention is meritless. Viewing the facts in the light most favorable to plaintiff, it is clear that the escalation to the use of deadly force can hardly be blamed on Gonzalez. Barfield stated that Gonzalez "removed" the tape from Jackson's hand. Barfield's account does not indicate that this was done in a violent or even offensive manner. While it is true that Gonzalez waved his nightstick in front of him, there is no dispute that he neither struck nor attempted to strike Jackson or Barfield. As stated earlier, it was reasonable for Gonzalez to make an investigatory stop, and his conduct in effectuating the stop was reasonable in light of Jackson's repeated attempts to leave the Arcade before Gonzalez could question him.

Even assuming, *arguendo,* that Gonzalez' initial conduct in taking the tape and waving his nightstick was unwarranted, those actions alone could not justify Jackson's contemplation of the use of deadly force. Such a relatively minor intrusion could not give Jackson a license to escalate the confrontation by reaching for the weapon he concealed in his jacket.

Plaintiffs have not produced a scintilla of evidence which suggests that under the circumstances another police officer in Gonzalez' place would not have believed that Jackson posed an imminent threat of serious bodily harm or death or that some lesser amount of force would have been sufficient to counter the real threat of seri-

ous harm that Jackson posed.[6] After months of discovery, they have not presented any testimonial, documentary or physical evidence that even suggests that Gonzalez' actions were unreasonable, and from which a jury might return a verdict in their favor.

As to the fourth factor, plaintiffs have not proffered any direct evidence that Gonzalez acted maliciously. Gonzalez stated that he fired three times because Jackson continued to come at him after the first shot. He also stated that in his nine years with the RPD this incident was the "one and only time" he had shot his service revolver at an individual. Plaintiffs have offered no evidence to contradict these assertions, or to even create an inference that Gonzalez' actions were motivated by malice.

The shooting of Jackson is a tragedy which we all hope there will be no need to repeat. However, under the circumstances it was not a brutal act which shocks the conscience, nor under the *Johnson* test was it egregious and unreasonable conduct. Based on the undisputed facts, a rational factfinder could not find that Gonzalez applied excessive force. Accordingly, I find that, as a matter of law, Gonzalez' use of deadly force in self-defense was reasonable under the circumstances, and therefore, did not violate the Fourteenth Amendment.[7]

Having exonerated Gonzalez from any claim of a constitutional violation, there is no basis for asserting liability against the municipal defendants. If Gonzalez did not inflict a constitutional injury, the City and its employees in the RPD cannot be held liable under § 1983. Whether the City had a policy or custom which might have authorized or supported the use of constitutionally excessive force is "beside the point" if a person has suffered *no constitutional injury* at the hands of the individual police officer. *City of Los Angeles v. Heller,* 475

U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed. 2d 806 (1986); *Dodd v. City of Norwich,* 827 F.2d 1, 8 (2d Cir.1987).

### b. *Unconstitutional Policy or Custom*

■ Even assuming, *arguendo,* that Officer Gonzalez' conduct was constitutionally impermissible, the record establishes no possible basis for holding the municipal defendants liable. A local government cannot be held liable under § 1983 on a theory of *respondeat superior. Pembaur v. Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986).[8] A municipality is subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury...." *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Further, the policy or custom must be the "moving force of the constitutional violation." *Id.* at 694, 98 S.Ct. at 2037; *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 820, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1985) (plurality).

Plaintiffs have failed to proffer evidence of a policy or custom of the City on which an unconstitutional loss of Jackson's life could be premised. The amended complaint bases the City's liability on several theories: that the municipal defendants promulgated policies which "permitted Officer Gonzalez to act with impunity (these policies are not specifically identified)," that they failed to properly screen, train and supervise officers, that they ratified Officer Gonzalez' wrongful conduct and similar wrongful conduct, and that they failed to take precautions to put officers on notice of the existence of persons with psychiatric disabilities. However, plaintiff's opposition papers address only the theory

---

**6.** In opposition to this motion, plaintiffs submitted *only* a 10–page memorandum of law which included one exhibit: Barfield's sworn statement.

**7.** In light of my conclusion that Officer Gonzalez did not use excessive force against Jackson, I find that plaintiffs' claims of a conspiracy in

violation of 42 U.S.C. § 1985 and of a denial of equal protection are groundless and do not merit discussion.

**8.** There is, of course, no evidence that defendants Korn, Leach and the unidentified RPD officers were personally involved in the shooting of Jackson.

of the municipal defendants' "ratification" of Gonzalez' conduct.[9] They do not provide any evidentiary support for this theory. Rather than providing concrete particulars which point to the existence of an unconstitutional policy or custom, plaintiffs merely make the conclusory argument that the City's failure to reprimand or discipline Officer Gonzalez in connection with the shooting of Jackson constitutes such a policy.

Generally, a single incident of illegal police conduct is insufficient to meet a plaintiff's burden of establishing that a policy or custom of the municipality is the moving force behind the deprivation of his constitutional rights. *Tuttle*, 471 U.S. at 820, 105 S.Ct. at 2434. In addressing the nature and quantum of proof that is required to meet this burden, the Supreme Court has reiterated that:

Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof that the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*Tuttle*, 471 U.S. at 823–24, 105 S.Ct. at 2436–37 (footnotes omitted).

Plaintiffs have not identified an express municipal policy that is unconstitutional on its face and thus susceptible of easy proof.

Rather, as in *Tuttle*, the policy on which plaintiffs' rely is "nebulous" at best. Thus, they must adduce "considerably" more proof than a single incident. A policy of condoning police abuse cannot be inferred from the Jackson shooting alone. Although the amended complaint alleges that the City has ratified not only the alleged wrongful conduct involved in the present action, but also "similar wrongful conduct," plaintiffs have not offered any evidence of such wrongful conduct. They failed to produce any evidence which might establish that persons in positions of responsibility in the local government were so deliberately indifferent to prior incidents of police misconduct as to tacitly encourage, condone or acquiesce in such behavior. *See Turpin v. Mailet*, 619 F.2d 196 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Accordingly, there is no basis for imposing liability on the municipal defendants, and the federal claims against these defendants must be dismissed.

## C. Pendent State Claims

Plaintiffs also seek relief on state law claims of assault (fourth cause of action), loss of consortium (fifth cause of action), and wrongful death (sixth cause of action). Having determined that plaintiffs federal claims must be dismissed, and there being no diversity of citizenship between the parties, the court declines to take jurisdiction of the state law claims. This decision is in keeping with the principle that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Robison*, 821 F.2d at 925. Ac-

---

**9.** In support of their motion, the municipal defendants submitted the affidavits of Gordon Urlacher, Chief of Police of the RPD, Joseph Davis, captain in charge of the RPD's Professional Development Section, Thomas Conroy, an RPD captain who is commander of the Professional Standards Section, and Scott Hill, an RPD Lieutenant who is director of the Research and Evaluation Section. These affidavits set forth at length the RPD's pre-employment screening procedures, its extensive training program which includes instructions on dealing with persons who appear to be psychiatrically impaired, its

supervision and periodic evaluation procedures, and statistics for the period 1982 through 1986 concerning RPD police officers' use of their firearms. Plaintiffs have not proffered any evidence to dispute or in any way impugn defendants' substantial evidence that the RPD's police officers are properly screened, trained and supervised. Nor have they specifically identified or offered proof of a custom or policy which authorizes RPD police officers to use excessive force in confrontations with citizens, particularly blacks.

**790**

cordingly, the plaintiffs state law claims are dismissed.

### CONCLUSION

For the reasons stated above, defendants' motions for summary judgment dismissing plaintiffs' federal claims and to dismiss plaintiffs' pendent state claims are granted. Plaintiffs action against all defendants is dismissed in its entirety.

IT IS SO ORDERED.