[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The respondent Bruce Minichino challenges the constitutionality of a Connecticut statute, C.G.S. 46b-15, which permits an ex parte restraining order for relief from physical abuse by a family member to issue without prior notice or hearing. Defendant's due process challenge asserts that CT Page 3158 the procedural safeguards provided by the statute do not satisfy the protections required by the Federal and State Constitutions. In addition, respondent claims that the statute, as applied in his case, was unconstitutional. The defendant has therefore requested that the Ex Parte Order be dismissed.
 I.
The marriage of Tia Pendleton and Bruce Minichino was dissolved on May 31, 1991. At that time, custody of their two children, Brett and Nikki (ages 6 and 5 respectively), was awarded to Ms. Pendleton and Mr. Minichino jointly. The record shows that at the time of the ex parte order, Mr. Minichino had the children with him on six out of every fourteen nights. On January 22, 1992, Tia Pendleton applied for an ex parte order pursuant to 46b-15 of the Connecticut statutes to be issued to restrain Mr. Minichino with respect to herself and her children.
Conn. Gen. Stats. 546b-15(b) specifically permits the court to make such orders concerning temporary child custody or visitation rights as appropriate in its discretion to protect the applicant and his/her children.[1] If a present and immediate danger to the applicant is alleged, C.G.S. 546b-15(b) permits the court to issue an ex parte order temporarily suspending visitation rights until the date of the hearing which must be held no later than fourteen days following the issuance of the order. If a postponement of the hearing is granted on request by either party, the statute permits the court to extend the order for good cause shown. Deprivation of custody and other relief following the hearing are permitted by C.G.S. 46b-15 (d) as a matter of judicial discretion for up to ninety days or if, on a motion for additional time, the court deems it necessary to continue the order for longer than ninety days.
Section 46b-15 (b) requires that the applicant file an affidavit, made under oath, which includes "a brief statement of the conditions from which relief is sought." The sworn affidavit accompanying Ms. Pendleton's application alleges that the respondent has a "history of psychological illness", has committed certain acts of a violent and harassing nature, refused on one occasion to return the children on time, and that the respondent recently made a threatening statement to the applicant. The affidavit also refers to an alleged recent change perceived by the applicant in the respondent's circumstances and behavior.
As to Mr. Minichino's alleged "history of psychological CT Page 3159 illness", two hospitalizations are specified in the affidavit: one in April 1990 for an attempted suicide by an overdose of muscle relaxants and a second hospitalization in February 1991 for depression. The affidavit also alleges certain incidents of a violent nature: that in September 1990, Ms. Pendleton had witnessed Mr. Minichino destroying her car in an "apparent act of aggression" relating to the divorce pending at the time; that in December 1990, Mr. Minichino had "destroyed property within the dwelling" owned jointly at that time and that during the same incident, Mr. Minichino had "placed his hands upon me on more than one occasion and pushed and shoved me. He also tore the shower curtain from the bathroom and struck me on the foot causing me to seek medical attention and miss time from work."
Ms. Pendleton's affidavit also refers to an occasion in October, 1991 on which she complained to the local police department due to Mr. Minichino "efforts to harass me including calling me at home and at work and frequently driving past my home and place of business to `watch me.'" The affidavit indicates that a warrant issued for the arrest of Mr. Minichino on that charge of harassment on or about October 22, 1991.
The affidavit alleges an incident in which Mr. Minichino refused to return the children in accordance with the separation agreement and shared parenting agreement. According to the affidavit, Mr. Minichino did not return the children until three days after the children were due back.
The most recent incident to which the affidavit makes reference is a statement allegedly made by Mr. Minichino on January 15, 1992. The applicant stated in her affidavit: "Bruce commented to me that he was again depressed and that, "[t]his time I'm not going alone. You better watch your back." Ms. Pendleton relates in the affidavit what she understood by the remark: "In the context of our conversation, I understood this to mean that he was contemplating suicide again and that he might attempt to take the life of my children and/or me." On the day of the alleged threat, Mr. Minichino had custody of the children. The affidavit recounts that, in response to the "threat", Ms. Pendleton filed a complaint with the police which resulted in the arrest of Mr. Minichino on the charge of "threatening" and on the warrant for harassment outstanding since the previous October. The arrest was made at respondent's home in the presence of the children. The affidavit indicates a family violence protective order was issued as a result of the alleged threat which restrained Mr. Minichino with regard to Ms. Pendleton. The affidavit states that, "I was not present in court when the judge made this CT Page 3160 order or I would have requested that the relief be extended to include our children at that time."
The applicant's affidavit further alleges an apparently recent change in Mr. Minichino's behavior: "Bruce Minichino has stated to me that he has lost his job and is unemployed. He has not dealt rationally with me since before I filed for divorce and the loss of his job has, in my opinion, made him more depressed, angry and irrational than at any earlier time."
Finally, Ms. Pendleton's affidavit states, "I believe that I and my children are in physical danger and that he should not be permitted to visit with the children without supervision and that he should not be permitted to have contact with me under any circumstances." Likewise, in her application, Ms. Pendleton represents that she and her children had been "subjected to the threat of present physical pain and injury" by Mr. Minichino and that there was an "immediate and present physical danger to the Applicant and her children at the hands of the Respondent."
The relief requested by Ms. Pendleton in her application was for an ex parte order, effective immediately, to temporarily modify the existing custody orders by suspending Mr. Minichino's right of visitation while the order remained in effect. In addition, the application requested that the respondent be enjoined from the following: entering or remaining in the applicant's dwelling; imposing any restraint upon the person or liberty of the applicant or the children; abusing, harassing or threatening the applicant or the children in any way, whether in her home or in any private or public place; attacking, molesting or assaulting the applicant or the children in any way, whether in her home or in any private or public place; interfering with or invading the privacy of the applicant or the children in any way. The relief requested, including the modification of the custody arrangement, is in accordance with the relief permitted under C.G.S. 46b-15 (b).
An ex parte order granting the relief requested by the applicant was issued on the date of application, January 22, 1992 at 4:58 p. m. by Jones, J. Fourteen days later, on February 4, 1992, a hearing was held at which time the respondent filed his Motion to Dismiss. After the hearing, Mr. Minichino's visitation rights were reinstated by Norko, J. but the residual orders restraining the respondent as to the applicant and the children were continued.
 II.
Respondent claims that his constitutionally protected CT Page 3161 interest in his custodial relationship with his children was taken from him in violation of his due process rights. The ex parte order temporarily modified the existing joint custody arrangement and deprived respondent of his visitation rights for fourteen days, up to the date of the full evidentiary hearing held on February 4, 1992. Although Mr. Minichino is still subject to the balance of the provisions of the restraining order, his visitation rights were reinstated at the hearing. In order for this matter to continue it requires an actual controversy between or among the parties; that the interests of parties be adverse; that the matter in controversy be capable of being adjudicated by the judicial power and that determination of the controversy will result in practical relief to the complainant. State v. Nardini, 187 Conn. 109,111-112 (1982). Since the respondent is no longer deprived of the asserted constitutionally protected interest, his motion to dismiss on constitutional grounds is moot unless the matter is capable of repetition yet will evade review. The Supreme Court has stated that, in absence of a class action, the "capable of repetition yet evading review" doctrine is limited to situations where two elements combine (1) that the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. Weinstein v. Bradford, 423 U.S. 147,149 (1975); Connecticut Foundry Company v. International Ladies Garment Workers Union, AFL-CIO, 177 Conn. 17, 21 (1979). In this case the challenged action, the ex parte order, was only fourteen days in duration and therefore too short to be fully litigated prior to its cessation or expiration; secondly, there is a reasonable expectation that the same complaining party could be subjected to another ex parte order.
The Connecticut courts have stated that a matter which is capable of repetition, yet evading review is justiciable if the matter affects an ongoing program of the state's penal or civil system, the matter could affect the petitioner in the future, and the public importance of the matter makes it desirable to decide the issue. Franklin v. Berger, 15 Conn. App. 74,77-78 (1988); Shays v. Local Grievance Committee,197 Conn. 566, 572-73 (1985); Delevieleuse v. Manson, 184 Conn. 434,437 (1981). This case does concern an ongoing program of the state's civil system in family matters and the respondent could be affected by a similar order in the future. The problem of family violence is no doubt one of broad public importance leading to the enactment of the statute in question. The due process rights of the persons subject to the temporary deprivation of visitation permitted under the statute are important and subject to repetition yet evading review. The court therefore finds this matter justiciable. CT Page 3162
The core of respondent's argument is that the failure to provide the notice and hearing prior to a temporary deprivation of visitation rights as permitted by the statute violates his constitutionally protected due process rights. He claims the present statute does not afford the procedural safeguards necessary to justify the elimination of predeprivation notice and hearing under the analysis set forth by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319 (1976). Further, the respondent argues that his due process rights were violated by the statute as applied to him, chiefly for lack of a showing of an immediate physical danger.
There can be no doubt that there is sufficient state action involved in this case to trigger due process considerations: the statute enables a victim of family violence to utilize state procedures with the "overt, significant assistance of state officials" to obtain relief. Tulsa Professional Collection Services, 485 U.S. 478, 486. (1988) In this case state procedures available by statute were utilized so as to deprive the respondent of the visitation rights for the fourteen days prior to the hearing, at which time his visitation rights were reinstated.
A state statute has a presumption of constitutional validity. Alaska Packers Asso. v. Industrial Accident Commission of California, 294 U.S. 532, 543 (1935). A validly enacted statute carries with it a strong presumption of constitutionality and those who challenge its constitutionality must sustain the heavy burden of proving it is unconstitutional beyond a reasonable doubt. Bartholomew v. Schweizer, 217 Conn. 671,675 (1991). State v. Breton, 212 Conn. 258, 269 (1989). Although there are no prior decisions in Connecticut to serve as a guide in this constitutional challenge to C.G.S. 46b-15, there are at least four similar cases in other jurisdictions which, though not controlling, are significant for the fact that no court has struck down a similar statute.[2]
Notice and the opportunity to be heard are the cornerstone of due process and must be afforded by the state in a meaningful time and meaningful manner prior to deprivation of a protected interest. Fuentes v. Shevin, 407 U.S. 67, 80
(1972). Boddie v. Connecticut, 401 U.S. 371, 377 (1971). A predeprivation hearing is required except when extraordinary circumstances exist where a valid government interest is at stake so as to justify the postponement of a hearing. Id. at 377-378. The general rule requiring predeprivation notice and hearing is not absolute in cases where only a temporary taking is involved. Goss v. Lopez, 419 U.S. 565, 582 (1975). Due process is not a fixed, technical concept unrelated to the CT Page 3163 time, place and circumstances in a particular case. Connecticut v. Doehr, ___ U.S. ___ 111 S.Ct. 2105, 2112
(1991); Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961). The requirements of the due process clause vary with the interest involved and the nature of the subsequent proceeding. Boddie v. Connecticut, supra at 378. Constitutional due process does not mandate any particular procedure but rather requires that certain safeguards exist in whatever procedural form is afforded. Mathews v. Eldridge, 424 U.S. 319, 334
(1976); Society for Savings v. Chestnut, 176 Conn. 563, 572-3
(1979). Hartford Federal Savings Loan v. Tucker, 196 Conn. 172,176 (1985), stay denied, 474 U.S. 896 (1985), cert. denied, 474 U.S. 920 (1985).
Respondent argues that notice and hearing were indispensable in this case given the interest at stake and the relative ease with which notice could have been afforded under the facts of the case. In particular, respondent argues that although there were various "divorce post judgment motions" pending at the time of the ex parte order and Mr. Minichino's attorney was physically present in the courthouse on January 22, 1992, no attempt was made to inform the court of these facts. Respondent argues notice could have been given by merely directing the sheriff to go to the courtroom and ask respondent's attorney to drop by the chambers. Applicant's attorney disputed the respondent's assertion that there was no attempt to contact Mr. Minichino's attorney and the allegation that Mr. Minichino's attorney was even present nearby at 4:58 p. m. when the order for ex parte relief was issued.[3]
Even if the respondent's argument were not disputed, the notion that notice must be given because it is easy to do so is a practical, not principled, argument and not a legal requirement.
When the burden of increased procedural safeguards affects not the government, but the party seeking relief under the statute, the relevant analysis to be applied in the determination of the process due is the variation of that set down by the Supreme Court in Mathews v. Eldridge in a recent case, Connecticut v. Doehr, supra, with respect to the due process protections required when a prejudgment attachment is sought ex parte:
 For this type of case, therefore, the relevant inquiry requires, as in Mathews, first, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, in contrast CT Page 3164 to Mathews, principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or foregoing the added burden of providing greater protections.
Connecticut v. Doehr, ___ U.S. ___ 111 S.Ct. 2105, 2112
(1991).
Applying the first factor of the Mathews/Doehr analysis, it is clear that the respondent's private interest in his visitation rights pursuant to a joint custody order was an important and constitutionally protected liberty interest. Board of Regents v. Roth, 408 U.S. 564, 572 (1972); Stanley v. Illinois, 405 U.S. 645, 651-2 (1972). Lassiter v. Department of Social Services, 452 U.S. 18, 27 (1981). A parent's custody of his child is a liberty interest entitled to constitutional protection and to be given its full weight. Lehr v. Robertson,463 U.S. 248, 256-60 (1983). Bendiburg v. Dempsey, 707 F. Sup. 1318,1325 (N.D.Ga. 1989). The State may not interfere with parents' custodial rights absent due process protections. Langton v. Maloney, 527 F. Sup. 538, 549 (D.Conn. 1981). Even a noncustodial parent's visitation rights have been held to be entitled to due process protection. Ruffalo v. Civiletti, D.C.Mo.,539 F. Sup. 949, 952 (W.D.Mo. 1982) aff'd 702 F.2d 710, (8th Cir. 1983), on remand 565 F. Sup. 34 (W.D.Mo. 1983). The fact that the respondent's visitation rights were interrupted only temporarily by the ex parte order does not eliminate the interest and the concomitant due process protection required since the length and consequent severity of a deprivation of a constitutionally protected interest are but factors to be weighed in determining the appropriate form of hearing but not decisive of the basic right to a prior hearing of some kind. Fuentes v. Shevin, 407 U.S. 67, 86 (1972). Though temporary, the deprivation of visitation rights is considerable and cannot be restored. The court therefore concludes that respondent was temporarily deprived of a significant constitutionally protected interest without prior notice or hearing.[4] The deprivation of visitation rights can occur for, at most, fourteen days under the statute unless the respondent fails to appear, consents to a postponement of the hearing, or, on a motion, the court finds it necessary to continue the order. C.G.S. 46b-15 (b) and (d). While the deprivation is not the sole factor in the due process determination it must be accorded its full weight when considered along with the risk of erroneous deprivation and the interests of the applicant and government in seeking issuance of the order.
The second factor in the Mathews/Doehr analysis requires CT Page 3165 an assessment of the risk of erroneous deprivation through the procedure provided in the statute and the probable value of additional or alternative safeguards. Respondent argues the risk of erroneous deprivation here is too great to permit an ex parte order to issue on the basis of a "conclusory" affidavit. Essex Group Inc. v. Ducci Elect, 181 Conn. 524, 525
(1980); Kukanskis v. Griffith, 180 Conn. 501, 504 (1980). As respondent explains, the conclusory affidavit may be incomplete or inadequate, and malice or a desire to manipulate on the part of the applicant may be the actual basis motivating for the applicant pursuing an ex parte order, especially in divorce cases. Since a mere conclusory affidavit will not reveal these potential dangers, respondent argues, judicial confrontation is required to properly assess the basis of the assertions in the application. Confrontation by a judge is especially important when a dispute rests on testimony of individuals or persons motivated by malice, vindictiveness or intolerance, Greene v. McElroy, 360 U.S. 474, 496 (1959). In Connecticut v. Doehr, supra, the Supreme Court determined the risk of error to be substantial where a Connecticut statute required only a skeletal affidavit to be filed with respect to a prejudgment attachment sought in connection with an alleged assault since the latter is not an ordinarily uncomplicated matter lending itself to documentary proof. Id. at 2114. In such a case, the Supreme Court held, even a detailed affidavit would give only the plaintiff's version of the confrontation and the judge could not make a realistic assessment concerning the likelihood of the action's success based on the "one-sided, self-serving and conclusory submissions" contained in the plaintiff's complaint. Id. at 2114.
A review of the affidavit and application filed in this case, however, leads this court to the conclusion that the affidavit was not merely conclusory and the risk of erroneous deprivation in this case was minimal despite the potential dangers of "ulterior motives" lingering in such cases. Section 46b-15 (b) permits the court to issue an ex parte order granting such relief as it deems appropriate if an applicant alleges "an immediate and present physical danger to the applicant" which was alleged by the applicant in this case with respect to herself and her children explicitly in her application[5] In addition, the conditions set forth in the accompanying affidavit reasonably support a conclusion that the applicant satisfactorily demonstrated she and her children were threatened with an immediate and present physical danger. The affidavit was not merely conclusory but set forth, in detail, a short history of events, sometimes of a violent and harassing nature — crowned with the alleged "threat" by the respondent — against a backdrop of psychiatric treatment for his suicide attempt and depression and recent personal hardship involving CT Page 3166 the loss of his job.[6] This context and the alleged threat provided sufficient documentary foundation for a judge to find that there was a fair probability an immediate and present physical danger existed with respect to the applicant and the children as a basis for issuance of the ex parte order.[7]
Mr. Minichino's alleged remarks to the applicant, that he was again depressed and, "[t]his time I'm not going alone. You better watch your back," are at the very least menacing and disturbing and it was not unreasonable to find that the words constituted an immediate and present physical danger to the applicant and/or the children. It cannot be said that, if the alleged threat was made, there was no basis for the applicant's concern since the respondent had "sole" custody of the children in his own home at the times of his visitation.
The respondent argues that the applicant's claim of present and immediate danger is undercut by the fact that she waited seven hours to call the police on the night of the alleged threat and seven days until seeking the ex parte order since this delay belies any claim of imminent danger. As a result, it might be argued, the statute was unconstitutional as applied here since it permitted the ex parte order to issue on the basis of mere verbal abuse. Indeed, as respondent notes, no claim of a "continuous threat of physical pain or physical injury" was alleged by the applicant.[8] Respondent notes that C.G.S. 46b-38a(1) defines family violence as the following:
 Family violence prevention and response: Definitions. For the purpose of sections 46b-38a to 46b-38f, inclusive: (1) "Family violence" means an incident resulting in physical harm, bodily injury or assault, or an act of threatened violence that constitutes fear of imminent physical harm, bodily injury or assault between family or household members. Verbal abuse or argument shall not constitute family violence unless there is present danger and the likelihood that physical violence will occur.[9]
Respondent argues that the alleged threat, even if it is believed to have been uttered, did not constitute "an incident resulting in physical harm, bodily injury or assault, or an act of threatened violence that constitutes a fear of imminent physical harm, bodily injury or assault", the definition of family violence under 46b-38a (1) because the physical harm was demonstrably not imminent given the delay involved in applying for the order. But the fact that the applicant's fears of a present and immediate danger did not materialize within seven hours or seven days does not dismiss the probability that the CT Page 3167 present and immediate danger continued unabated until the time the ex parte order was sought and beyond. And the respondent's statement, if uttered in fact, could certainly be construed reasonably as posing "a present danger and likelihood that physical violence will occur" in which case even if the verbal abuse alone is considered here, the court finds it to be "family violence" by definition under 46b-38a(1).
The risk of erroneous deprivation may be more significant in other cases, and is not absent here, but the party challenging the constitutionality of a statute must prove the statute has adversely affected a protected interest under the facts of his particular case and not merely under some possible or hypothetical set of facts not proven to exist. State v. Zach, 198 Conn. 168, 176 (1985); General Elec. Supply Co. v. SNETCO, 176, 185 Conn. 583, 593 (1981). The due process clause "has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible `property' or `liberty' interest be so comprehensive as to preclude any possibility of error." Mackey v. Montrym, 443 U.S. 1, 13 (1979). Here, based on the "four corners" of the application and the affidavit, the documentary allegations provided to the judge in this case suffice to conclude the risk of erroneous deprivation at the time of the issuance of the ex parte order was not substantial enough to warrant a conclusion that the deprivation in this case was arbitrary.[10]
The second prong of the Mathews/Doehr analysis calls for an assessment of the value of additional or substitute safeguards in addition to consideration of the risk of erroneous deprivation. Respondent argues that a practical safeguard in this case would have been to summon the attorney from the next room. A proposed safeguard that notice should be given to every respondent's attorney where practicable would hardly be a valuable additional safeguard since it would necessarily lead to a time-consuming evidentiary hearing as to whether such notice was in fact "practicable." See endnote 5, p. iii.
The respondent asserts the value of various additional procedural safeguards: requiring, for example, the presence of the companion file and the custody affidavit before the court at the time the ex parte order is sought would be helpful to indicate the "actual" motives of the applicant if issues as to visitation, custody and support are the real source of the problem between the applicant and respondent. Respondent suggests that requiring copies of police reports, medical reports, copies of other restraining orders would provide valuable information aiding the accurate discernment of the CT Page 3168 foundation or actual motives for the application for an ex parte order. The procedural safeguards suggested could no doubt be valuable if the necessity for scrutinizing the basis for the applicant's allegations closely is apparent to a judge and, indeed, any and all of these safeguards is available to the judge considering the application if he or she believes that further investigation is warranted. Or the judge may simply deny the application for an ex parte order pending notice and a full evidentiary hearing. The question in issue here is whether any of the proposed safeguards should have been required by the judge making the determination that an ex parte order could issue. As noted above, it was not arbitrary or unreasonable for the judge to issue the ex parte order based on the documented allegations alone in this case. Respondent has not demonstrated how the companion file or the custody affidavit, or any other evidence, would indicate that the motivations were other than as the applicant represented, that is, that she believed she and/or her children were in a present and immediate physical danger.
The respondent argues that the police report concerning the arrest of the respondent on the evening after the alleged threat, for example, indicates that there was no basis for believing the children were at any risk and, indeed, the report does show that the children were found to be "in fine condition" and that "there was no indication of neglect or abuse."[11] The unstated implication is that if police reports were required to be made available to the judge at the time of the ex parte order, maybe the order would not have issued. But the requirements of C.G.S. 46b-15 indicate that the legislature determined no strict proof of physical harm should be necessary to obtain an ex parte order when an applicant alleges a present and immediate danger of physical abuse and files a sworn affidavit with a statement of the conditions from which she or he seeks relief. The legislative history indicates that the nature and severity of the domestic violence problem was so important that legislation was required to permit persons access to the judicial system to prevent that domestic abuse from occurring.[12] The statute does not make the remedy dependent on proof of incidences of past physical abuse; a person who files an affidavit indicating the conditions from which relief is sought, who is subject to the continuous threat of present physical pain or physical injury, may apply for relief. Requiring the additional safeguard of presenting all prior police reports and/or medical reports in this case would in effect have presented an evidentiary obstacle to the applicant of requiring her to make a documentary proof of prior harm in order to obtain relief. To do so would clearly fall short of providing the preventive relief contemplated in this statute and quite possibly would be a time-consuming delay CT Page 3169 frustrating the effective and immediate protection that the legislature sought to make available.
Requiring that copies of all existing protective orders be presented to the judge reviewing the application is another proposed additional safeguard of no substantial value. Although presenting all existing protective orders to the judge may further the degree of judicial involvement as respondent argues, respondent has failed to demonstrate why, if the family violence protective order as to Ms. Pendleton were available to the judge issuing the ex parte order here, it would have precluded the court from issuing another order for the purpose of protecting the applicant's children. The court agrees with the fact that more than one protective order with respect to Ms. Pendleton existed may be exemplary of a certain degree of judicial duplication but the specific relief requested under the 46b-15 application was not ordered by the criminal court in the family violence protective order under46b-38c(d). The court in most of those cases, is without the benefit of the application and affidavit required by 46b-15
and does not have a full view of the specific situation and is limited to the information provided by the police report, not the victim. Only the application in this case could request the specific relief for the applicant's children.
The respondent argues that the statute is deficient for the failure to require posting of a bond by the applicant if seeking an ex parte order. If the law is not clear as to whether the Federal Constitution requires a bond when a prejudgment attachment is sought, Connecticut v. Doehr, supra, respondent claims the law is clear in Connecticut that when ex parte orders are sought for prejudgment attachment, bond is required to compensate the defendant if the seizure is in fact wrongful. Roundhouse Construction, 168 Conn. 371, 384
(1975). Assuming arguendo there is a certain constitutional requirement of bond in all cases of prejudgment attachment, it is by no means clear that the same would be true in domestic violence cases where the potential harm is of the nature of a "constitutional tort" for which culpable state, not private, action is required and which presents a circumstances where the risk of fraud and collusion is greater because of the familiarity of the parties. In addition, the requirement of bond would undercut the immediacy of action desired for prevention of domestic violence, one of the broad purposes of the legislation.[13]
Although more procedural safeguards would admittedly be desirable, there are at least a few essential safeguards provided by this statute. First, a postseizure hearing is required in fourteen days. Respondent claims that fourteen CT Page 3170 days of deprivation of visitation rights is not prompt enough to satisfy the requirements of due process. Domestic violence statutes have been enacted in every state and the District of Columbia; thirty-seven states, of which Connecticut is one, permit ex parte orders.[14] The hearing held fourteen days after the deprivation permitted by the Connecticut statute is well within the five to twenty day range found in similar statutes.[15] When balanced against the applicant's interest and government interests to be considered next, a hearing fourteen days after the deprivation here cannot be said to be unreasonable. Secondly, the applicant's petition is verified since the statute requires an affidavit made under oath and there is judicial involvement since only the court may issue the ex parte order. Blazel v. Bradley, 698 F. Sup. 756, 764
(W.D.Wis. 1988); Bradburn v. McIntosh, 159 F.2d 925, 931 (10th Cir. 1947).
The final step in the Mathews/Doehr analysis is consideration of, principally, the interest of the party seeking the prejudgment remedy, with due regard for any ancillary interest the government may have in providing the procedure or foregoing the added burden of providing greater protections. It is difficult to overstate the interest of the party seeking the ex parte order in the scenario of domestic violence. The legislative history specifically indicates the goal of the statute was to provide an effective legal remedy from the judicial branch for the prevention of domestic violence since the remedies available from the police department were found by the legislature to he unsatisfactory. (See endnote 12). The predecessor act of 46b-15, 46b-38, first made the ex parte order remedy available and contained a similar ex parte order provision. At the introduction of that prior act in the House of Representatives for passage, Mrs. Barnes (21st) remarked in support of the bill:
 Mr. Speaker, the subject of battered women is one of society's best kept secrets. For most women, the shame and the low self-esteem which are the results of suffering the physical and emotional trauma of abuse has caused them to hide the true dimensions of the problem. . . . we need to provide the means of relief through the courts so that those spouses living in a situation emotionally intolerable and physically dangerous will be protected.[16]
The Mathews/Doehr analysis also calls for "due regard for any ancillary interest the government may have in providing the procedure of foregoing the added burden of providing greater protections". Doehr, supra at 2112. The state has an interest in the health, safety, and welfare of its citizens and CT Page 317146b-15 promotes that interest. State legislatures have broad powers to enact legislation to protect the general health, safety and welfare. Day-Brite Lighting, Inc. v. Missouri,342 U.S. 421, 423-4 (1952). States have been given deference in adopting reasonable summary procedures when enacting legislation under their police power. Mackey v. Montrym,443 U.S. 1, 17 (1979). In addition, the state's interest in the health, safety and welfare of children is paramount. In proceedings concerning the custody of children, visitation rights are always subordinate to the interests of the child. Raymond v. Raymond, 165 Conn. 735, 741 (1974). "When a child's safety is threatened that is justification enough for action first and hearing afterward." Schramek v. Bohren, 429 N.W.2d 501,505 (Wis.App. 1988) quoting Lossman v. Pekarske, 707 F.2d 288,291 (7th Cir. 1983) (citation omitted). The superior court had authority to modify the existing custody order under46b-15 explicitly and, in addition, under 46b-56 which gives the superior court continuing jurisdiction with respect to child custody.
The legislative history to the predecessor act instituting the ex parte restraining order in Connecticut reveals the magnitude of the state's interest in passing legislation to counter the growing problem of domestic violence:
 Mr. Tulisano (29th): This is a very important bill. One of the, I think, major substantive changes in our law that this general assembly will address this year. It authorizes individuals to go before the court and seek restraining orders in the case of physical abuse by either spouse. There is presently existing an evidence of a great deal of abuse going on amongst spouses . . . . It is important. It does provide a means to go to court to protect an individual in the event one of these cases do occur.[17]
Mr. Roberti (126th), also speaking in support, said:
 I too rise in support of this bill, Mr. Speaker . . . . This problem has become an overwhelming problem in this country and I think that we have to begin to address these types of problems that people are afraid to speak about, to do anything about.[18]
The statute here, C.G.S. 46b-15, is directly necessary to effect the valid government interest in protecting the victims of physical abuse and preventing family violence in general. CT Page 3172 The, legislature can be presumed to have omitted strict showings of proof of imminent danger or further procedural safeguards in order to render the statute effective in meeting its intended goal. Given the compelling interest of the applicant in being free from physical abuse, the important interest of the government in preventing such abuse and the limited degree of risk of erroneous deprivation in this particular case, this court finds respondent has not carried his heavy burden of proving that the statute permits an unreasonable and unconstitutional summary procedure. Respondent's motion to dismiss is denied.
NORKO, JUDGE.